**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | |
|---|---|
| PIC MANAGEMENT HOLDING COMPANY OF WISCONSIN, LLC and PHYSICIANS IMMEDIATE CARE, LLC<br><br>Plaintiffs, | Case No. 25-CV-173 |
| v. | **JURY TRIAL DEMANDED** |
| COLUMBIA ST. MARY'S, INC., and ASCENSION HEALTH<br><br>Defendants. | |

## AMENDED COMPLAINT

Plaintiffs PIC Management Holding Company of Wisconsin, LLC ("PIC-Wisconsin") and Physicians Immediate Care, LLC ("PIC") submit this Amended Complaint against Defendants Columbia St. Mary's, Inc. ("Ministry") and Ascension Health ("Ascension") for breach of contract, unjust enrichment, repudiation, and quantum meruit.

## INTRODUCTION

1. Plaintiffs and Defendants established a joint venture for the operation of a system of "urgent care" facilities in the Milwaukee, Wisconsin area. Soon after the business was established, Defendants abandoned their contractual and statutory duties, leaving the urgent care facilities to struggle for survival for years on end. While Plaintiffs provided the parties' shared enterprise with much-needed short-term liquidity to salvage the failing businesses, Defendants stood by and did nothing, and they said nothing. The Plaintiffs' actions benefitted Defendants' other business interests, including their tax-exempt status, reputation, and continued association with Plaintiffs' good name in the urgent care industry. When the business ultimately failed, and

dissolution became the only apparent option, Ministry and Ascension attempted to simply walk away. In doing so, Defendants attempted to avoid millions of dollars owed to PIC and to evade similar amounts in future financial obligations.

2. In Summer 2020, PIC-Wisconsin and Ministry formed a joint venture (the "Joint Venture" or "JV") to open urgent care facilities under the name "Physicians Immediate Care." Under the terms of their agreement, PIC-Wisconsin and Ministry were equal owners and members of the JV. Both entities made identical capital contributions and enjoyed equal representation on the JV's board of managers. PIC-Wisconsin and Ministry also agreed that PIC was to perform certain administrative, accounting, and financial reporting functions as a subcontractor of the JV.

3. As part of its subcontracting role, PIC monitored the JV's operating accounts. As the performance of the Joint Venture faltered, Plaintiffs supplied liquidity in order to meet the JV's short-term obligations to keep urgent care facilities open, which included employee payroll, taxes, insurance, maintenance costs, and lease payments. The cash infusion was significant, and the Plaintiffs offered those funds based on the reasonable expectation that its partner Ministry would act in good faith, deal fairly with the Plaintiffs, and reimburse the Plaintiffs for 50% of the cash they fronted, as is clearly provided for in the relevant contracts related to the parties' JV.

4. For years, PIC performed accounting and financial reporting functions for the JV and routinely provided transparent reporting to both Ministry and its parent company, Ascension, as well as to the JV's board of managers. PIC repeatedly offered to prepare financial reporting in a manner most convenient for Ministry and Ascension, and to answer any questions from Ministry or Ascension's leadership. Based on information and belief, neither Ministry nor Ascension ever asked PIC any questions about the financial reporting or took up PIC on its offer to discuss the financials.

5. The facilities were initially successful, as much of the facilities' revenues came from testing and treatments related to COVID-19. Beginning in 2021, when the COVID-19 pandemic restrictions began to subside, the facilities saw a significant drop in revenues. The JV was not earning enough revenue to cover its costs, and its assets quickly dwindled in comparison to its liabilities.

6. PIC, in its capacity as the overseer of the accounts, had no choice but to fund the operating losses by providing much-needed cash infusions. Otherwise, the venture would have soon folded, to the detriment of all parties. The funding was necessary for the facilities to stay open, to pay their employees, and to meet their other financial obligations.

7. PIC immediately reported the JV's troubling financial position to Ministry and Ascension as well as to the JV's board of managers.

8. PIC implemented a new accounting strategy related to the JV's financial statements to call attention to the increasing monthly contributions from the Plaintiffs to the JV. These items ("deferred management fee" and "intercompany payable to PIC") were specially highlighted and conspicuous as recurring items in bright red font. Any reasonable businessperson or accounting or financial professional would have immediately noticed this important, yet troubling, item on the face of the financial statements.

9. PIC sent these financial statements to Ministry and Ascension on a regular basis and made regular financial presentations to the JV's board of managers.

10. The Plaintiffs continued to fund the urgent care facilities' losses with resilient optimism that the business would rebound to pre-pandemic patient volumes. PIC's market research and due diligence forecasted a strong financial outlook, and PIC has years of experience in the urgent care industry. However, the business did not rebound as expected. The COVID-19

pandemic fundamentally changed the urgent care industry in unexpected ways. As the pandemic faded, patients began returning to traditional emergency rooms for treatments, and the arc of flu seasons became more volatile and unpredictable. All the while, PIC routinely provided transparent financial reporting, including monthly financial statements in accordance with its contractual duties and generally accepted accounting principles.

11. Ministry and Ascension repeatedly ignored PIC's sounding of the alarms as to the troubling financial position of the business. In fact, Ministry and Ascension refused to engage in any constructive efforts to fix the situation whatsoever. Notably, despite the contractual and statutory duty of good faith and fair dealing owed to PIC-Wisconsin, neither Ministry, nor Ascension, nor any of the Ministry-appointed Joint Venture board members ever spoke up and told either Plaintiff that the Defendants had silently abandoned any joint effort to salvage the Joint Venture, that the Plaintiffs were on their own and that, while the Defendants would be happy to share in any gains, they would not share in any expenses. With the benefit of hindsight, it is now clear that Ministry and Ascension had no intent to be good partners, and from the outset agreed to contractual and statutory obligations that they were never willing to fulfill.

12. In late 2023, the board of managers decided the JV may need to be dissolved. Yet Ministry and Ascension refused to engage meaningfully in conversations about the appropriate resolution of the business. Moreover, the Plaintiffs had been left "holding the bag" because they had funded millions of dollars toward the JV, all with the reasonable expectation that, if the business could not turn around, Ministry and Ascension would split the losses.

13. Ministry and Ascension continue to obstruct progress and offer no commitment for their growing debt to Plaintiffs and the significant amount of future financial obligations, to which they are legally bound.

14. Upon information and belief, Ministry and/or Ascension owe Plaintiffs approximately $4,500,000 in unpaid fees and lease payments.

## PARTIES

15. PIC-Wisconsin is a limited liability company organized and existing under the laws of Delaware.

16. PIC-Wisconsin is wholly owned by its sole member PIC, which is a limited liability company organized and existing under the laws of Delaware.

17. PIC is wholly owned by its sole member ASP Urgent Care Investco Inc., which is a corporation organized and existing under the laws of Delaware. ASP Urgent Care Investco Inc.'s principal place of business is located at 281 Sanders Creek Parkway, East Syracuse, NY 13057.

18. Upon information and belief, Ministry is a corporation organized and existing under the laws of Wisconsin. Ministry's principal place of business is located at 2323 N. Lake Drive, Milwaukee, WI 53211.

19. Upon information and belief, Ascension is a nonprofit corporation organized and existing under the laws of Missouri. Ascension's principal place of business is located at 4600 Edmundson Rd., St. Louis, MO 63134-3806.

## JURISDICTION & VENUE

20. PIC-Wisconsin is a citizen of Delaware and New York.

21. PIC is also a citizen of Delaware and New York.

22. Upon information and belief, Ministry is a citizen of Wisconsin.

23. Upon information and belief, Ascension is a citizen of Missouri.

24. Neither of the Defendants is a citizen of any state of which either Plaintiff is a citizen.

25. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this case involves a dispute between citizens of different states, and the matter in controversy exceeds the sum or value of $75,000.

26. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to the claims in this action occurred in and/or the harm being caused is being suffered in this judicial district. Specifically, the events or omissions giving rise to the Plaintiffs' claims occurred in and around the four urgent care facilities in the greater Milwaukee, Wisconsin area. Additionally, the accounting, finance, payroll, and corporate offices of Ministry and/or Ascension Health are in the located in this judicial district.

## FACTUAL ALLEGATIONS

### The PIC Joint Venture

27. On or about May 18, 2020, PIC-Wisconsin and Ministry formed a limited liability company called Wisconsin Urgent Care Management, LLC (the "Joint Venture" or "JV"). PIC-Wisconsin and Ministry are the only members of the JV, which is registered and in good standing with the State of Wisconsin Department of Financial Institutions.

28. On or about September 1, 2020, PIC-Wisconsin and Ministry executed the Wisconsin Urgent Care Management, LLC Operating Agreement (the "Operating Agreement"). The Operating Agreement is a valid and binding contract. A true and accurate copy of the executed Operating Agreement is attached hereto as **Exhibit A**.

29. PIC-Wisconsin and Ministry formed the JV to "develop, operate and manage Urgent Care Centers (and Occupational Health Clinics if determined by the Members)." Ex. A § 3.1. Moreover, PIC and Ministry agreed that the JV:

> [S]hall be operated and managed in accordance with, and in furtherance of, the charitable and community-based healthcare purposes, mission, vision and values of the Ministry of promoting

> health and providing or expanding access to health care services to the sick, injured, aged, disabled and to the community at large and to engage in health education and promotion of wellness of the community at large.

*Id*.

30. The JV also separately entered into contribution agreements with PIC-Wisconsin and Ministry in which both PIC-Wisconsin and Ministry made equal initial capital contributions and agreed to receive their initial percentage interests in the JV in proportional exchange for the contributions.

31. The result of these contractual arrangements was that PIC-Wisconsin and Ministry were equal members in the JV for the Milwaukee-based system of urgent care centers.

32. Under the terms of the Operating Agreement, PIC-Wisconsin and Ministry agreed "not to violate a duty or obligation owed to the [JV] merely because the conduct of the Member furthers its own interests." *Id.* § 7.12. Moreover, the Operating Agreement has provisions that:

a. Prohibit members from unilaterally changing the tax structure or nature or purpose of the JV (§ 6.12(c)), issuing or transferring membership interests in the JV (§ 6.12(d)), requiring another member to endorse a JV obligation as a guarantor, surety, or otherwise (§ 6.12(g)), or changing the method and/or frequency of distributions from the JV (§ 6.12(h));

b. Demand capital contributions from members such that the membership interest of each member will be adjusted according to the changing total capital structure (§ 4.2);

c. Require all profits and losses to be specially allocated according to each member's interest (§ 5.2);

d. Compel members to make special capital allocations for compliance with federal income tax purposes (§§ 5.3, 5.4); and

e. Require members to act in good faith in making such allocations (§ 5.10).

33. The Joint Venture is a manager-managed LLC, with management responsibility vested in a six-member Board of Managers, with three members appointed by PIC-Wisconsin and three members appointed by Ministry.

34. Under the Operating Agreement and Wisconsin law, Ministry had unrestricted access, directly and/or through its board appointees, to minute and detailed information on every aspect of the Joint Venture's operations and financial performance and condition.

35. Under Wisconsin law, the members of the JV's board of managers owed fiduciary duties to the company and to its members, including PIC-Wisconsin.

36. Under Wisconsin law, Ministry, at all times relevant, owed a duty to act in good faith and to deal fairly with its joint venture partner, PIC-Wisconsin.

37. On or about September 1, 2020, PIC entered into an agreement to undertake certain accounting, bookkeeping, and reporting functions on behalf of the JV (the "Billing and Support Services Agreement"). A true and accurate copy of the executed Billing and Support Services Agreement is attached hereto as **Exhibit B**.

38. The Billing and Support Services Agreement provides in relevant part that the joint venture "desires to engage PIC as a subcontractor to provide and arrange for certain services for the urgent care and occupational health centers." Ex. B, 1. The Defendants knew and approved of the Billing and Support Services Agreement.

39. The JV established PIC urgent care centers in Brookfield, WI; Franklin, WI; Mt. Pleasant, WI; and South Milwaukee, WI.

40. These facilities incurred significant operating losses beginning in approximately 2022.

41. Pursuant to the Operating Agreement and the Billing and Support Services Agreement, PIC provided monthly accounting updates and financial reporting. This reporting was presented in a regular format consistent with generally accepted accounting principles and consistent with the course of dealings between the parties. The list of Ministry and Ascension employees to whom the financial reporting was disseminated was consistent, inclusive, and broad.

42. The financial reporting included balance sheets, income statements, and statements of cash flows. These items are consistent with industry practice and generally accepted accounting principles.

43. With each regular communication, PIC's controller offered to discuss the financial statements and answer any questions for Ministry and Ascension's staff.

**South Milwaukee Lease and Guaranty**

44. The landlord for the JV's South Milwaukee facility was TFG South Milwaukee, LLC ("TFG").

45. PIC, the original tenant, assigned the South Milwaukee lease to PIC-Wisconsin, which, in turn, assigned the lease to the JV.

46. The Defendants knew and approved of the assignment of the lease to the JV.

47. TFG agreed to the assignment of the South Milwaukee lease, but only if Ministry and PIC executed a Guaranty of the JV's obligations under the lease.

48. Ministry and PIC agreed to unconditionally guaranty the JV's obligations under the lease. A copy of the September 1, 2020 Guaranty among TFG, Ministry, and PIC is attached as **Exhibit C** (the "South Milwaukee Guaranty").

49. Under Section 4 of the South Milwaukee Guaranty, Ministry promised that, if PIC made any payment necessary to satisfy the JV's obligations under the lease, Ministry would reimburse PIC for that payment so that "all obligations and liabilities" under the South Milwaukee Guaranty would be borne equally by PIC and Ministry.

50. Due to its faltering performance, by no later than July 2022, the JV was not able to fulfill its obligations under the South Milwaukee lease and remains unable to do so through today.

51. PIC has made or arranged for all of the lease payments to TFG since July 2022 and continues to do so.

52. The Defendants have known or should have known since at least July 2022 that the JV was unable to fulfill its obligations under the South Milwaukee lease.

53. The Defendants have known or should have known since at least July 2022 that PIC has been making or arranging for payment of the rent and otherwise fulfilling the obligations and liabilities of the JV under the South Milwaukee lease and pursuant to the South Milwaukee Guaranty.

54. PIC has demanded in writing that Ministry reimburse PIC for its disproportionate assumption of those obligations.

55. Ministry has not reimbursed PIC for the payments made in order to satisfy the JV's obligations under the South Milwaukee lease and pursuant to the South Milwaukee Guaranty.

**Mount Pleasant Lease and Guaranty**

56. The landlord for the JV's South Milwaukee facility was TFG Mount Pleasant LLC ("TFGMP").

57. PIC, the original tenant, assigned the lease to PIC-Wisconsin, which, in turn, assigned the lease to the JV.

58. The Defendants knew and approved of the assignment of the lease to the JV.

59. TFGMP agreed to the assignment of the Mount Pleasant lease, but only if Ministry and PIC executed a Guaranty of the JV's obligations under the lease.

60. Ministry and PIC agreed to unconditionally guaranty the JV's obligations under the lease. A copy of the September 1, 2020 Guaranty among TFGMP, Ministry, and PIC is attached as **Exhibit D** (the "Mount Pleasant Guaranty").

61. Under Section 4 of the Mount Pleasant Guaranty, Ministry promised that, if PIC made any payment necessary to satisfy the JV's obligations under the lease, Ministry would reimburse PIC for that payment so that "all obligations and liabilities" under the Mount Pleasant Guaranty would be borne equally by PIC and Ministry.

62. Due to its faltering performance, by no later than July 2022, the JV was not and is not able to fulfill its obligations under the Mount Pleasant lease and remains unable to do so through today.

63. PIC has made or arranged for all of the lease payments to TFGMP since July 2022 and continues to do so.

64. The Defendants have known or should have known since at least July 2022 that the JV was unable to fulfill its obligations under the Mount Pleasant lease.

65. The Defendants have known or should have known since at least July 2022 that PIC has been making or arranging for payment of the rent and otherwise fulfilling the obligations and liabilities of the JV under the Mount Pleasant lease and pursuant to the Mount Pleasant Guaranty.

66. PIC has demanded in writing that Ministry reimburse PIC for the disproportionate assumption of those obligations.

67. Ministry has not reimbursed PIC for the payments made in order to satisfy the JV's obligations under the Mount Pleasant lease and pursuant to the Mount Pleasant Guaranty.

**Ongoing Financial Obligations**

68. While the reimbursement for past operating losses is a significant part of PIC's damages, there is a separate and ongoing issue of Ministry and Ascension's obligations to responsibly wind down and/or dissolve the business. Just like the operational losses, Ministry and Ascension have been unwilling to engage in discussions on these issues.

69. PIC has engaged in efforts to sell the locations or market them to other small players in Wisconsin. PIC's brokers are even attempting to find non-medical tenants, which is a less-than-ideal resolution, as PIC would need to find a separate way to liquidate the facilities' fixtures and physical assets. However, it is unlikely there will be a solution in the near future.

**Lack of Good Faith and Fair Dealing**

70. Pursuant to Wis. Stat. §§ 183.0409(4), (9)(c) and 9(f), Ministry owed and owes PIC-Wisconsin a duty to exercise any of Ministry's contractual rights consistently with the duty of good faith and fair dealing.

71. Ministry did not act in good faith or deal fairly with the Plaintiffs.

72. Under the Joint Venture's Operating Agreement, Ministry appointed half of the managers who served on the Joint Venture's Board of Managers. Ministry at all times had the ability to remove and replace any of the managers it appointed.

73. In addition to Ministry owing the duties of good faith and fair dealing in relation to its nomination, appointment, and retention of its board appointees, Ministry's appointees themselves owed PIC-Wisconsin the fiduciary duties of loyalty and care.

74. Ministry knew or should have known, directly or through its board appointees, of the significant financial and operational struggles of the Joint Venture.

75. Ministry knew or should have known, directly or through its board appointees, that its Joint Venture partner, PIC-Wisconsin, and its affiliate, PIC, were advancing funds and foregoing fees owed, in order to maintain the viability of the parties' *shared* enterprise.

76. In lieu of keeping the joint venture alive, the Plaintiffs could have simply let the shared enterprise perish as early as July 2022.

77. Instead, the Plaintiffs advanced funds and paid for the expenses necessary to keep the shared venture alive.

78. The Defendants knew or should have known that the Plaintiffs did so with the expectation that its 50/50 joint venture partner would not silently allow the Plaintiffs to take on that burden without advising the Plaintiffs, directly or through Ministry's board appointees, that the Defendants had absolutely no intention to contribute to or reimburse the Plaintiffs for the life-sustaining funds and efforts that the Plaintiffs contributed to the shared enterprise.

79. Had the Defendants, directly or through Ministry's board appointees, acted in good faith, and simply advised the Plaintiffs that the Defendants would rather abandon the enterprise than contribute to its continuation, the Plaintiffs would have, far earlier, walked away from the shared venture and been spared the extraordinary expense and effort expended due to the Defendants' bad faith.

80. The Defendants walked away, but did so *sub silentio*, in violation of the duties of fairness and good faith that Ministry owed.

**<u>Efforts to Resolve the Issues</u>**

81. Despite Ministry and Ascension's assertion that they were unaware of the dire financial straits, Plaintiffs' efforts to resolve these issues in a mutually acceptable way is well-documented.

82. Although the troubling financial performance was evident for months, the Joint Venture's board convened a meeting to discuss the dismal financial outlook and question the JV's future on October 18, 2023. At the meeting, Jacqueline Morris (Chief Strategy and Development Officer for PIC's parent company) issued a formal request for a capital call in accordance with the terms of the Operating Agreement. This meeting began Plaintiffs' unsuccessful efforts to collect Ministry/Ascension's portion of the losses. Plaintiffs simultaneously embarked on an effort to responsibly dissolve the business by selling assets and assigning leases.

83. On December 5, 2023, Plaintiffs assembled a meeting with Ministry/Ascension to discuss the JV's future. This was the first meeting that involved the broader staff from all parties.

84. On December 12, 2023, the Joint Venture's board convened a second meeting to discuss the future of the PIC facilities in Milwaukee.

85. On December 20, 2023, Jacqueline Morris provided a memorialization of the latest board meetings. Ms. Morris' email stated the following:

> Good afternoon Drew, Matt and Chad. Following up from the discussion at our December 12 Board of Managers meeting (and those in August and October prior), I wanted to memorialize our discussions pending formalizing the matters discussed.
>
> - Capital Call. As noted in the October 18 and December 5, 2023 Board of Managers calls, and as described in the email dated December 5th, a capital call is (and has) been necessary to fund the losses incurred by and continuing to be incurred by the business. This amount should be paid within 30 days of December 5 (January 4, 2024). We understand it is moving forward with your internal accounting team and believe we've provided all additional accounting information requested, as well as made ourselves available for calls. Please confirm the status. (presentation from October 8 meeting and email from December 5 are attached).
>
> - Mount Pleasant Site. We understand that you are not interested maintaining the Mt. Pleasant site; accordingly, as discussed at the December 5 Board of Managers meeting, we

> expect the JV to cease operations there no later than January 31, 2024.
>
> - Other 3 Sites – Taking Over Ownership. We understand that you are potentially interested in taking ownership and control of the other three sites and that you've notified Ascension corporate of that interest. We will need to address the lease obligations and other past and ongoing liabilities in connection with the transfer of assets and employees from the JV. As you requested, Tony will follow shortly with the information regarding the FTEs employed at the relevant sites, noting Brookfield is not currently actively staffed.
>
> - Closure by 1/31/2024. Please note that, also as discussed at the December 5th meeting, we would expect to cease operations at the remaining two open sites also by January 31, 2024. In order to enable an orderly transition of employees from [PIC] to Ascension, we are happy to be constructive here but need to know your decision on both the sites and employees as soon as possible and no later than January 5th.
>
> - Due Diligence / Team Engagement. It would be helpful if we could consult with your acquisition team and put our respective legal counsel in touch with each other as soon as possible, so that we may fulfill any remaining due diligence requests and move forward expeditiously towards an agreed deal. Please advise on timing and process to engage on this front.
>
> - Bi-weekly Calls. To ensure we remain tightly connected as we work to resolve the above, I propose we have bi-weekly or weekly calls commencing the week of January 1. Is there an assistant on your side that can work with Katie (cc'd) to schedule this series?
>
> Looking forward to connecting on these items soon. Thank you for your attention, and Happy Holidays!"

86. On January 18, 2024, Plaintiffs and Defendants had yet another meeting to discuss the JV's future.

87. On January 22, 2024, Plaintiffs reiterated the request for reimbursement. Plaintiffs also stated that, unless Ascension took immediate steps to fund its share of the deficit, Plaintiffs

would formally notify the JV on January 31, 2024, that it could no longer fund operation of the urgent care centers and, as a result, it would terminate all employees effective immediately. Plaintiffs also stated that, as of February 1, 2024, Plaintiffs would cease funding any lease payments on behalf of the JV.

88. Between January 22 and January 29, 2024, Ascension appeared to be cooperative and open to a mutually agreeable wind-down of the business.

89. Plaintiffs offered to facilitate the transfer of clinical employees from the urgent care clinics supported by the JV to positions with Ministry and Ascension upon the wind-down of the business, and in support of that offer, made a good faith effort to provide Ministry and Ascension with employees' contact information. To the best of Plaintiffs' knowledge, Ministry and Ascension did not, however, respond to that opportunity.

90. On January 29, 2024, Ministry and Ascension formally notified Plaintiffs that they elected not to make any additional capital contribution to the JV.

91. In turn, on February 23, 2024, at the Special Board meeting, PIC-Wisconsin also formally notified Ministry and Ascension that it elected not to make any additional capital contribution to the JV. Plaintiffs' prior cash contributions were not capital contributions, and Ministry and Ascension were well aware of this fact. Because the JV's ownership structure is measured by capital contributions to date — and neither PIC-Wisconsin nor Ministry had made additional capital contributions, those parties continued to share equal ownership of the JV. Those parties also share equal responsibility for the JV's liabilities.

92. On January 31, 2024, Ministry and Ascension's deadline to take steps to pay the balance had passed.

93. On February 7, 2024, Plaintiffs sent Ministry and Ascension a proposed arrangement for splitting the JV's ongoing rent payments for six months while the parties negotiated the reimbursement of past losses. The rent payments totaled approximately $525,000. Plaintiffs proposed that each party pay half.

94. On February 8, 2024, Ministry and Ascension responded that the proposal generally seemed acceptable. However, Ministry and Ascension refused to offer a hard commitment. This began a pattern of troubling communication from Ministry and Ascension. From that date forward, Ministry and Ascension responded to Plaintiffs' calls and messages in a relatively timely manner but refused to commit to any deadlines or courses of action. In short, Ministry and Ascension demonstrated no willingness to fix the situation to which they were contractually bound.

95. On February 8, 2024, Ministry and Ascension agreed to the rent fee arrangement proposed by Plaintiffs.

96. On February 8, 2024, Plaintiffs suggested to Ministry and Ascension that the next JV board meeting be held on February 19, 2024, in order for both sides to complete the necessary financial analyses and agree on a resolution such that the board could decide at the meeting how to dispose of the business.

97. Ministry and Ascension did not respond.

98. February 21, 2024, Plaintiffs emailed Ministry and Ascension with a set of financial statements detailing the monthly accrual of the JV's operating losses. Plaintiffs asked the Ascension team for their availability to discuss the information.

99. Ministry and Ascension never responded.

100. On April 12, 2024, Plaintiffs assembled a conference call with the Ministry/Ascension team to discuss a resolution of the issues.

101. On April 15, 2024, Plaintiffs provided notes of the April 12, 2024, meeting, including an analysis of the monthly accrual of the JV's operating losses. Plaintiffs also reiterated that it had previously shared this information with Ministry's finance team in February 2024.

102. Plaintiffs also memorialized the agreement reached on the April 12, 2024, call, which was that Ministry/Ascension would make the negotiated rent payment within ten days. This was $190,382.50, which was 50% of the amount that accrued to date since October 2023.

103. Plaintiffs also addressed the issue of the "visibility to the losses," explaining that Plaintiffs had been sending periodic financial reports over the years, and that Ascension was on notice of the JV's poor financial performance.

104. On April 18, 2024, Ministry/Ascension responded with follow-up questions, which Plaintiffs promptly answered. Ministry and Ascension did not respond, let alone confirm the arrangement that was reached on the April 12, 2024, conference call.

105. On May 21, 2024, after more than three weeks of silence, Plaintiffs asked for an update from Ministry and Ascension. Plaintiffs also provided Ministry and Ascension with past emails documenting Plaintiffs' record of providing regular financial reporting to Ascension.

106. Discussions between Plaintiffs and Ministry/Ascension have broken down beyond repair.

**COUNT I**
**Breach of Contract**
**PIC-Wisconsin v. Ministry**

107. Plaintiffs incorporate by reference the preceding paragraphs as if set forth here in their entirety.

108. The Operating Agreement is a valid and enforceable contract.

109. PIC-Wisconsin has satisfied all conditions precedent to enforcement of the Operating Agreement.

110. In the Operating Agreement, Ministry agreed that it would prohibit members from making certain changes to the business structure. Specifically, in § 6.2, Ministry agreed that:

> Neither the Board of Managers, the Officers, nor any agent of the LLC may cause the LLC to do any of the following, which decisions shall be reserved to the unanimous approval of the Members:
>
> 1. Change the tax structure or the nature of the business or purpose of the Company;
>
> 2. Issue or transfer any membership interests in the Company or admit additional members in the company;
>
> 3. Require any Member to endorse a Company obligation as a guarantor, surety, or otherwise;
>
> 4. Change the method and/or frequency of distributions from the Company.

111. In the Operating Agreement, Ministry agreed that additional capital contributions could be demanded from time to time for various reasons. Specifically, in § 4.2, Ministry agreed that:

> If the Managers determine that additional Capital Contributions are reasonably required from time to time, the managers shall request the Members to make to the LLC additional Capital Contributions in proportion to their respective Percentage Interests, . . . No Member shall be required to make an additional Capital Contribution, provided that if a Member or Members elect not to make an additional Capital Contribution, the other Members shall have the right to contribute to the LLC the amount of cash that the noncontributing Member or Members fail to contribute. . . .The Membership Interest of each Member will be adjusted to equal its Capital Amount divided by the fair market value of all of the Membership Interests immediately after the additional Capital Contributions have been made.

112. In the Operating Agreement, Ministry agreed that capital accounts in the JV would be maintained in accordance with various federal laws and regulations. For example, in § 5.1, Ministry agreed that:

> The LLC will maintain a Capital Account for each Member according to the rules of Treasury Regulations Section 1.704-1(B)(2)(iv). For this purpose, the LLC may, upon the occurrence of the events specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of such regulation and Treasury Regulation Section 1.704-1(b)(2)(iv)(g) to reflect a revaluation of LLC property.

113. In the Operating Agreement, Ministry agreed that all profits and losses to be specially allocated according to each member's interest. Specifically, in § 5.2 Ministry agreed:

> For each Fiscal Year of the LLC, after adjusting each Member's Capital Account for all Capital Contributions and distributions during such Fiscal Year and ***all special allocations pursuant to Sections 5.3 and 5.4 hereof, all Profits and Losses (other than Profits and Losses specially allocation pursuant to Sections 5.3 and 5.4) shall be allocated to the Members' Capital Accounts*** in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be a positive or a negative balance) shall be equal to (i) the amount which would be distributed to such Member, determined as if the LLC were to liquidate all of its assets for the Gross Asset Value thereof and distribute the proceeds thereof (after payment of all LLC debts, liabilities and obligations) pursuant to Section 5.8, minus (ii) the sum of (A) such Member's share of LLC Minimum Gain and (b) such Member's share of Member Nonrecourse Minimum Gain.

114. In the Operating Agreement, Ministry agreed that members could be compelled to make special capital allocations for compliance with federal income tax purposes. Specifically, in § 5.3 and § 5.4, Ministry agreed that:

> ***The Members agree to make certain special allocations to comply with certain requirements of the Treasury Regulations***. The Partnership Representative shall make such special allocations of income and loss for federal income tax purposes pursuant to the Treasury Regulations. *See id.* § 5.3.
>
> The allocations set forth in Sections 5.3(a) - (h) hereof (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of LLC income, gain, loss or

> deduction pursuant to this Section 5.4 … [T]he Board shall make such offsetting special allocations of LLC income, gain, loss or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all LLC items were allocated pursuant to Sections 5.2, 5.3(i), and 5.5.

115. In the Operating Agreement, Ministry agreed that members are required to act in good faith in making such allocations. Specifically, the Operating Agreement provides:

> Upon the determination to distribute, remit or pay funds in any manner expressly provided in this ARTICLE V, made in good faith, the Members shall incur no liability on account of such distribution, even though such distribution may have resulted in the LLC retaining insufficient funds for the operation of its business, which insufficiency resulted in loss to the LLC or necessitated the borrowing of funds by the LLC.

116. Ministry also agreed not jeopardize Ministry's tax-exempt status. Specifically, § 14.7 of the Operating Agreement provides:

> The LLC shall operate its business in a manner so as not to jeopardize the tax-exempt status of Ministry or any of its Affiliates, as organizations described in Section 501(c)(3) of the Code [and] the Members shall discuss in good faith amending this Agreement as necessary.

117. Under statutory and common law, Ministry also owed the duty of good faith and fair dealing to PIC-Wisconsin in Ministry's conduct and exercise of any of its rights under the Operating Agreement.

118. Ministry, and by extension Ascension, breached these provisions when it acted in bad faith and refused to contribute capital as required under the Operating Agreement.

119. Ministry breached its duties by sitting idly and silently by and failing to contribute financially or otherwise to salvage the business, or alternatively not informing the Plaintiffs that

the Defendants intended to contribute nothing and that, if the Plaintiffs opted to do so, they were doing so on their own without any support from the Defendants.

120. Ministry's breaches of contract are a direct and proximate cause of damages to PIC-Wisconsin.

121. All conditions precedent to the relief requested herein have been performed, have occurred, or have been waived.

122. As a result of Ministry's breaches, PIC-Wisconsin has suffered, and will continue to suffer, damages, including but not limited to:

a. Irreparable harm

b. Compensatory damages

c. Consequential damages

d. Costs of enforcing the Operating Agreement, including attorneys' fees and expenses, in accordance with § 15.6 of the Operating Agreement

123. Ministry's breaches of the Operating Agreement have caused, and will continue to cause, PIC-Wisconsin harm in an amount to be determined at trial.

**COUNT II**
**Breach of Contract**
**PIC v. Ministry**

124. Plaintiffs incorporate by reference the preceding paragraphs as if set forth herein in their entirety.

125. PIC and Ministry are parties to the South Milwaukee Guaranty.

126. PIC has made payments to fulfill the JV's liabilities and obligations under the South Milwaukee lease and pursuant to the South Milwaukee Guaranty.

127. PIC has requested reimbursement from Ministry in writing.

128. Ministry has not reimbursed PIC.

129. PIC has asked Ministry for assurances that Ministry will fulfill its obligations under the South Milwaukee Guaranty.

130. Ministry has not provided adequate assurances.

131. Ministry's breaches of the South Milwaukee Guaranty have caused PIC damages and will cause PIC future harm.

**COUNT III**
**Breach of Contract**
**PIC v. Ministry**

132. Plaintiffs incorporate by reference the preceding paragraphs as if set forth herein in their entirety.

133. PIC and Ministry are parties to the Mount Pleasant Guaranty.

134. PIC has made payments to fulfill the JV's liabilities and obligations under the Mount Pleasant lease and pursuant to the Mount Pleasant Guaranty.

135. PIC has requested reimbursement from Ministry in writing.

136. Ministry has not reimbursed PIC.

137. PIC has asked Ministry for assurances that Ministry will fulfill its obligations under the Mount Pleasant Guaranty.

138. Ministry has not provided adequate assurances.

139. Ministry's breaches of the Mount Pleasant Guaranty have caused PIC damages and will cause PIC future harm.

**COUNT IV**
**Unjust Enrichment**
**PIC-Wisconsin, PIC v. Ministry, Ascension**

140. Plaintiffs incorporate by reference the preceding paragraphs as if set forth here in their entirety.

141. PIC provided accounting and administrative services for the JV, as well as for other business ventures. Ministry and Ascension capitalized on this relationship for years. Ministry and Ascension advertise their tax-exempt status and identity as a Catholic health ministry. These constitute legal benefits that Ministry and Ascension unfairly received.

142. Ministry and Ascension were not only aware of this benefit, but they also actively sought it out. For years, Ministry and Ascension continued the JV relationship with Plaintiffs precisely because they knew they were receiving the benefit of continued services from PIC.

143. Ministry and Ascension accepted and retained the benefit under circumstances making it inequitable for Ministry and Ascension to retain the benefit without payment of value.

144. Ministry and Ascension were unjustly enriched in an amount to be determined at trial.

**COUNT V**
**Repudiation**
**PIC-Wisconsin, PIC v. Ministry, Ascension**

145. Plaintiffs incorporate by reference the preceding paragraphs as if set forth here in their entirety.

146. Ministry and Ascension have refused to recognize the existence of the Operating Agreement, the Billing and Support Services Agreement, the Management Agreement, and other contracts at issue in this case.

147. Alternatively, Ministry and Ascension have acted inconsistent with the contracts' existence.

148. Ministry and Ascension have declined to perform in accordance with the contracts.

149. Ministry and Ascension have made unequivocal statements that they will not perform the promises owed under the contracts.

150. The JV has ongoing obligations to pay leases at urgent care clinics. Ministry and Ascension have refused to recognize the existence of these liabilities. These leases are long-term contracts that extend into the future.

151. Ministry's continued breaches and anticipated future breaches have caused, and will continue to cause, PIC harm in an amount to be determined at trial.

**COUNT VI**
**Quantum Meruit**
**PIC-Wisconsin, PIC v. Ministry, Ascension**

152. Plaintiffs incorporate by reference the preceding paragraphs as if set forth here in their entirety.

153. This Count is pled in the alternative, if Ministry and Ascension contend there is no valid and enforceable contract.

154. PIC engaged in a contractual relationship with the JV, and by privity, with Ministry and Ascension for the execution of certain accounting, financial, and operational duties for the benefit of the JV.

155. PIC performed those duties within the highest standards of professional practice.

156. These services were valuable to Ministry and Ascension, as they reaped the benefit of accounting services.

157. Moreover, these services were performed in conjunction with those for other business relationships. Ministry had a vested interest in keeping these relationships going.

158. The value of this benefit, the existence of any contract notwithstanding, continues to damage PIC harm in an amount to be determined at trial.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs demand judgment and relief in their favor, and against Defendants on all causes of action as follows:

a. For injunctive relief:

   i. Enforcing the Operating Agreement;

   ii. Enforcing the Billing and Support Services Agreement;

   iii. Enforcing the South Milwaukee Guaranty;

   iv. Enforcing the Mount Pleasant Guaranty;

b. For actual and/or liquidated damages totaling $4,477,044 or in an amount to be proven at trial, including but not limited to:

   i. compensatory damages, consequential damages, disgorgement of any ill-gotten gains, and unjust enrichment; and

   ii. Repudiation damages, including but not limited to the ongoing and future lease obligations that PIC continues to fund.

c. For pre-and post-judgment interest as allowed by law;

d. For punitive and/or exemplary damages;

e. For attorneys' fees and costs incurred in connection with this action; and

f. For other such and further such relief as the Court may deem equitable, just, and proper.

**JURY DEMAND**

Under Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right by a jury.

**DATED** this 27th day of March, 2025.

Respectfully submitted,

/s/ *Joseph R. Welsh*
Kevin P. Allen, WIED #: 76426

Joseph R. Welsh, WIED #: 329626
Emily S. Bley, WIED #: 329197
Harry M. Byrne, WIED #: 311733
Attorneys for Plaintiff
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: +1 215 979 1000
Fax: +1 215 979 1020
E-mail: kpallen@duanemorris.com
E-mail: jrwelsh@duanemorris.com
E-mail: ebley@duanemorris.com
E-mail: hmbyrne@duanemorris.com

**CERTIFICATE OF SERVICE**

I certify that on March 27, 2025, a copy of the foregoing was filed electronically through the Court's ECF System. Notice of this filing will be sent to all counsel of record and the parties may access this filing through the Court's ECF System.

*/s/ Joseph R. Welsh*