**WISCONSIN URGENT CARE MANAGEMENT, LLC**

**OPERATING AGREEMENT**

**Dated as of September 1, 2020**

## TABLE OF CONTENTS

**ARTICLE I. DEFINITIONS** ........ i
1.1 Definitions ........ i
1.2 Additional Terms ........ xii

**ARTICLE II. ORGANIZATION** ........ xii
2.1 Formation ........ xii
2.2 Adoption of Agreement ........ xii
2.3 Name ........ xii
2.4 Principal Place of Business ........ xii

**ARTICLE III. PURPOSE AND POWERS** ........ xii
3.1 Purposes ........ xii
3.2 Powers ........ xiii

**ARTICLE IV. CAPITAL** ........ xiii
4.1 Membership Interests and Amendments to Exhibit B ........ xiii
4.2 Additional Contributions ........ xiii
4.3 No Interest or Right to Withdraw ........ xiv

**ARTICLE V. ALLOCATION OF INCOME AND LOSSES; CASH DISTRIBUTIONS** .. xiv
5.1 Capital Accounts ........ xiv
5.2 Profits and Losses ........ xiv
5.3 Special Allocations ........ xiv
5.4 Curative Allocations ........ xvi
5.5 Other Allocation Rules. ........ xvi
5.6 Tax Allocations; Code Section 704(c) ........ xvii
5.7 Allocations of Profits, Losses and Distributions in Respect of Interest Transferred ........ xvii
5.8 Distributions of Available Cash Flow ........ xviii
5.9 Distributions Upon Liquidation ........ xviii
5.10 Consequences of Distributions ........ xix
5.11 Modification ........ xix

**ARTICLE VI. RIGHTS AND DUTIES OF MEMBERS** ........ xix
6.1 Rights and Duties ........ xix
6.2 Liability of Members ........ xix
6.3 Annual Meetings ........ xix
6.4 Special Meetings ........ xx
6.5 Waiver of Notice ........ xx
6.6 Voting ........ xx
6.7 Quorum ........ xx
6.8 Action at Meetings ........ xx
6.9 Informal Action by Members ........ xx
6.10 Enforcement of Contracts between LLC and a Member ........ xx
6.11 Powers Reserved to Ministry ........ xxi

6.12 Unanimous Member Approval ........ xxi

ARTICLE VII. BOARD OF MANAGERS ........ xxii
7.1 General Powers and Duties ........ xxii
7.2 Number, Election and Term ........ xxii
7.3 Chairperson of the Board ........ xxii
7.4 Removal and Resignation ........ xxii
7.5 Vacancy ........ xxii
7.6 Meetings ........ xxiii
7.7 Waiver of Notice ........ xxiii
7.8 Quorum ........ xxiii
7.9 Action at Meetings ........ xxiii
7.10 Informal Action by Managers ........ xxiii
7.11 Board of Managers Committees ........ xxiii
7.12 No Breach of Duty ........ xxiii
7.13 Observation and Information Rights ........ xxiv
7.14 Payer Strategy ........ xxiv
7.15 Unanimous Manager Approval ........ xxv

ARTICLE VIII. OFFICERS ........ xxvi
8.1 Officer Designation ........ xxvi
8.2 Officer Election ........ xxvi
8.3 Term ........ xxvi
8.4 Removal ........ xxvi
8.5 Vacancies ........ xxvi
8.6 Duties of President ........ xxvi
8.1 Duties of Secretary ........ xxvi
8.2 Qualifications ........ xxvi
8.3 Compensation ........ xxvi

ARTICLE IX. ACCOUNTING, BOOKS AND BANK ACCOUNTS ........ xxvi
9.1 Accounting Period; Audit Cooperation ........ xxvi
9.2 Books ........ xxvi
9.3 Bank Accounts ........ xxvii
9.4 Reports and Financials ........ xxvii

ARTICLE X. INDEMNIFICATION ........ xxvii
10.1 Authority to Indemnify ........ xxvii
10.2 Limitations on Authority to Indemnify ........ xxviii
10.3 Mandatory Indemnification ........ xxviii
10.4 Advances for Expenses ........ xxviii
10.5 Court Ordered Indemnification ........ xxviii
10.6 Determination and Authorization of Indemnification ........ xxix
10.7 Indemnification of Employees and Agents ........ xxix
10.8 Insurance ........ xxix
10.9 Nonexclusive Right ........ xxx
10.10 Billing and Support Services Agreement and Management Agreement ........ xxx


Case 2:25-cv-00173-SCD Filed 03/27/25 Page 3 of 54 Document 13-1

**ARTICLE XI. TAX MATTERS** .......... xxx
11.1 Tax Matters .......... xxx
11.2 Partnership for Tax Purposes Only .......... xxxi
11.3 Withholding and Entity Taxes .......... xxxi

**ARTICLE XII. TRANSFER** .......... xxxi
12.1 Restriction on Transfer. .......... xxxi
12.2 Rights of First Refusal; Right of First Opportunity. .......... xxxiii
12.3 Involuntary Transfers and Defaults. .......... xxxiv
12.4 Buy-Sell Provision .......... xxxv
12.5 Additional Members .......... xxxvi

**ARTICLE XIII. DISSOLUTION AND WINDING UP OF THE LLC'S EXISTENCE** xxxvii
13.1 Existence .......... xxxvii
13.2 Dissolution .......... xxxvii
13.3 Distribution on Dissolution .......... xxxvii

**ARTICLE XIV. MEMBER COVENANTS** .......... xxxviii
14.1 Exclusivity .......... xxxviii
14.2 Confidentiality .......... xxxix
14.3 Other Activities .......... xl
14.4 Ownership of Intellectual Property .......... xl
14.5 Compliance with Laws .......... xli
14.6 Ethical and Religious Directives; Antidiscrimination .......... xli
14.7 Operations in a Manner Consistent With Charitable Purposes .......... xlii

**ARTICLE XV. GENERAL PROVISIONS** .......... xlii
15.1 Notices .......... xlii
15.2 Integration .......... xlii
15.3 Applicable Law .......... xlii
15.4 Severability .......... xliii
15.5 Binding Effect .......... xliii
15.6 Enforcement .......... xliii
15.7 Amendment .......... xliii
15.8 Compliance with Laws .......... xliii
15.9 Referrals .......... xliii
15.10 Federal Health Care Programs .......... xliii

# WISCONSIN URGENT CARE MANAGEMENT, LLC

## OPERATING AGREEMENT

THIS OPERATING AGREEMENT is made and entered into as of September 1, 2020 (the "**Effective Date**"), by and between PIC Management Holding Company of Wisconsin, LLC ("**PIC**") and Columbia St. Mary's, Inc. ("**Ministry**").

## RECITALS:

A. Wisconsin Urgent Care Management, LLC, was formed on May 19, 2020 as a limited liability company pursuant to the Wisconsin Limited Liability Company Act.

B. The Members desire to set forth herein their respective relationships, rights, obligations and agreements with respect to the LLC and the governance thereof.

C. The LLC has or will enter into contribution agreements with each Member pursuant to which the Members have made or will make their initial capital contributions and subsequent planned contributions, and the Members have agreed to receive their Initial Percentage Interests in the LLC in exchange for their capital contributions.

NOW, THEREFORE, in consideration of the mutual promises, covenants and undertakings hereinafter contained, and in reliance upon the Recitals, which are incorporated by reference, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Members hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

1.1 Definitions. As used herein the following terms shall have the indicated meanings. Terms not otherwise defined herein shall have the meaning set forth in Act.

"Act" means the Wisconsin Limited Liability Company Act in effect on the date hereof and as may be hereafter amended.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii) Debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Adjusted EBITDA" means net earnings before interest, taxes, depreciation and amortization, as determined in accordance with U.S. generally accepted accounting principles, excluding management fees.

"Affiliate" with respect to any individual or Entity, means any individual or other Entity directly or indirectly controlling, controlled by, or under common control with such individual or Entity. Notwithstanding the foregoing, in no event shall (i) Ascension Investment Management, LLC, a Missouri limited liability company, any Affiliate of Ministry that is exempt from federal taxation under Section 501(c)(3) of the Code and that functions as a hospital foundation, or any successor, or (ii) Ascension Ventures, LLC, a Missouri limited liability company, or any successor, in any case be an Affiliate of Ministry for any purpose under this Agreement or the Master Affiliation Agreement.

"Agreement" means this Operating Agreement, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto," and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

"Ascension Multi-Facility Transaction" means Ministry, or any of its Affiliate's, (i) acquisition of a business that includes Ministry Restricted Business, provided that less than 20% of the net revenues generated by the acquired business for the twelve (12) month period ending on the closing of such acquisition are generated by the Ministry Restricted Business; (ii) acquisition of a business that includes multiple facilities in more than one state; or (iii) an affiliation through an agreement or otherwise in partnership with a third-party, provided that less than 20% of the net revenues generated by the third-party's business for the twelve (12) month period ending on the execution date of the agreement or the closing of the affiliation are generated by Ministry Restricted Business.

"Articles of Organization" means the Articles of Organization of the LLC filed with the Department of Financial Institutions of the State of Wisconsin, as amended from time to time.

"Available Cash Flow" means all cash on hand of the LLC, less the sum of the following to the extent paid or set aside by the LLC:

(i) All current maturities of principal and interest payments on indebtedness of the LLC;

(ii) All cash required for the payment of accounts payable and other current liabilities of the LLC in the ordinary course of business; and

(iii) Such financial reserves as the Board deems reasonably necessary for the proper operation of the LLC's business, cash required for projected working capital to fund the operation of the business of the LLC in the ordinary course of business for the

succeeding twelve-month period and cash required for projected capital expenditures of the LLC for the succeeding twelve-month period.

"Billing and Support Services Agreement" means that certain Billing and Support Services Agreement of even date herewith by and between PIC Parent and the LLC, pursuant to which PIC Parent has agreed to provide certain billing and administrative services on behalf of the LLC (including any HIPAA Business Associate Agreement between such parties arising therefrom).

"Board" or "Board of Managers" shall refer to those individuals described in ARTICLE VII in whom the management of the LLC is vested, who shall be vested with all of the authority conferred upon "managers" within the meaning of the Act.

"Buy-Sell Notice" shall have the meaning set forth in Section 12.4(a).

"Buy-Sell Trigger" shall have the meaning set forth in Section 12.4.

"Buyout Event" means, with respect to any Member, any of the following: (i) exclusion from participation in any "federal health care program" as defined in 42 U.S.C. § 1320a-7b(f) (including Medicare, Medicaid, TRICARE and similar or successor programs with or for the benefit of any governmental authority); (ii) any action that violates the *Ethical and Religious Directives for Catholic Health Care Services*, as promulgated by the local bishop and amended from time to time; (iii) indictment for, conviction of or plea of guilt or nolo contendere with respect to any felony, any crime involving moral turpitude or any crime in connection with the delivery of health care services; or (iv) any act or omission that would reasonably be expected to materially damage the business interests, reputation or goodwill of another Member or materially harm another Member or any of its patients, employees, contractors or vendors.

"Call Right" shall have the meaning set forth in Section 12.4(b).

"Capital Account" means, with respect to any Member, the Capital Account maintained in accordance with the following provisions:

(i) To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Section 5.3 or Section 5.4 hereof, and the amount of any LLC liabilities assumed by such Member or which are secured by any Property distributed to such Member;

(ii) To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section 5.3 or Section 5.4 hereof, and the amount of any liabilities of such Member assumed by the LLC or which are secured by any property contributed by such Member to the LLC;

(iii) In the event all or a portion of an interest in the LLC is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the Board shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the LLC or the Members), are computed in order to comply with such Treasury Regulations, the Board may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to ARTICLE XIII hereof upon the dissolution of the LLC. The Board also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of LLC capital reflected on the LLC's balance sheet, as computed for book purposes in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

"Capital Amount" shall have the meaning set forth in Section 4.2.

"Capital Contributions" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the LLC with respect to the Membership Interest held by such Member pursuant to the terms of this Agreement. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the LLC by the maker of the note or a Person related to the maker of the note within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(c) shall not be included in the Capital Contribution of any Member until the LLC makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(d)(2).

"Certificate of Formation" means the Certificate of Formation of the LLC filed with the Department of Financial Institutions of the State of Wisconsin, as amended from time to time.

"Change in Control" shall mean (i) any merger or other form of reorganization, recapitalization or consolidation involving a Member or its Affiliate with or into another Person resulting in Persons owning, directly or indirectly, fifty percent (50%) or more of the voting power in such Member prior to such merger, reorganization, recapitalization or consolidation, failing to own, directly or indirectly, fifty percent (50%) or more of the voting power of the resulting Person; or (ii) a sale of all or substantially all of the assets of a Member (other than to an Affiliate of such Member) in any transaction or series of related transactions; or (iii) the acquisition by any Person or "group" (as such term is defined in Rule 13d-4 under the Securities Exchange Act of 1934, as amended) of fifty percent (50%) or more of the voting power of a Member. Each Member agrees to deliver written notice to the other Member as soon as practicable prior to the proposed Change in Control, but in no event less than thirty (30) days prior to the proposed Change in Control.

"Clinic" means any Urgent Care Center, Occupational Health Clinic, or walk-in clinic that offers consistent extended and weekend hours and services similar to (whether or not including laboratory and x-ray capabilities) those services provided in an Urgent Care Center, but excluding any such Urgent Care Center, Occupational Health Clinic, or walk-in clinic owned by either Member (or any of the respective Affiliates) as of the date of this Agreement (or if acquired or developed by such Member or Affiliate after the date of this Agreement, was so acquired or developed in accordance with this Agreement and the Master Affiliation Agreement) and which are not contributed by such Member to LLC.

"Clinical Collaboration Agreement" means a Clinical Collaboration Agreement that shall be entered into between the Members, LLC and one or more physician practices relating to the patient care services at an Urgent Care Center or Occupational Health Clinic.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"Company Clinic" means any Urgent Care Center, Occupational Health Clinic or walk-in clinic that offers consistent extended and weekend hours and services similar to (whether or not including laboratory and x-ray capabilities) those services provided in an Urgent Care Center, in each case that is owned, managed or operated by the LLC.

"Contributed Assets" shall have the meaning set forth in Section 5.9(a).

"Deadlock" means if, after the earlier of the five-year anniversary of the Effective Date or a Change in Control, in respect of actions set forth in Section 7.15(a), after two (2) successive meetings of the Board held at least ninety calendar days apart, the required approval has not been obtained for more than 30 days after a Manager has delivered written notice to the Board that a Deadlock exists.

"Default" has the meaning set forth in Section 12.3(a).

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deductions for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"Designee" shall have the meaning set forth in Section 7.13(a).

"Effective Date" shall have the meaning set forth in the preamble hereto.

"Entity" means any corporation, partnership, trust, foundation, limited liability company, or other entity.

"Federal Healthcare Programs" means Federal health care programs as defined in 42 U.S.C. §1320a-7b(f).

"Financial Rights" means the right to share in profits, losses and distributions of the LLC and to receive interim and liquidation distributions of the LLC, and shall include a Member's distributional interest within the meaning of the Act.

"Fiscal Year" means (i) the period commencing on the effective date of this Agreement and ending on the immediately succeeding December 31, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in clause (ii) for which the LLC is required to allocate Profits, Losses, and other items of LLC income, gain, loss, or deduction pursuant to ARTICLE V hereof.

"Governance Rights" means all of each Member's rights as a Member in the LLC other than Financial Rights and the right to assign such Financial Rights.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Member to the LLC shall be the gross fair market value of such asset, as determined by the Board;

(ii) The Gross Asset Values of all LLC assets shall be adjusted to equal their respective gross fair market values as determined by the Board as of the following times: (a) the acquisition of an additional interest in the LLC by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (b) the distribution by the LLC to a Member of more than a *de minimis* amount of LLC Property as consideration for an interest in the LLC; and (c) the liquidation of the LLC within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that the adjustments pursuant to clauses (a) and (b) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interest of the Members in the LLC;

(iii) The Gross Asset Value of any LLC asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the Board; and

(iv) The Gross Asset Values of LLC assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m) and subparagraph (vi) of the definition of Profits and Losses and Section 5.3(g) hereof; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent the Board determines that an adjustment pursuant to subparagraph (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii), or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Healthcare Laws" means, to the extent applicable and that compliance is required, any and all federal, state or local Laws, regulating the health care industry or to the payment for services rendered by healthcare providers, including, but not limited to, all federal, state and local Laws pertaining to the confidentiality, privacy or security of individually identifiable health information, including the Administrative Simplification provisions of the Health Insurance Portability and Accountability Act of 1996 and its implementing regulations, the Standards for Privacy of Individually Identifiable Health Information, the Transactions and Code Set Standards and Security Standards for the Protection of Electronic Protected Health Information and the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009, as amended; the federal Medicare, Medicaid, and TRICARE statutes; the Stark Law and applicable state Law counterparts, the federal Anti-Kickback Statute and applicable state Law counterparts; the federal False Claims Act and applicable state Law counterparts; the federal Civil Monetary Penalties Law; the federal Criminal Penalties Law; any prohibition on the making of any false claim, false statement or misrepresentation of facts to any third party payor (including commercial payors) or any federal or state healthcare program; all federal or state Laws relating to fee-splitting; and all federal or state Laws governing assignment, reassignment, global billing and/or purchased diagnostic tests.

"Independent Third Party," means any Person who is not an Affiliate of a Member.

"Initial Percentage Interest" shall mean the Percentage Interest of each Member following the Initial Capital Contribution.

"Initiating Member" shall have the meaning set forth in <u>Section 12.4(a)</u>.

"Issuance Items" shall have the meaning set forth in <u>Section 5.3(i)</u>.

"Laws" means any federal, state or local law (statutory, common, or otherwise), rule, regulation, order, ordinance or other similar authority enacted, adopted, promulgated, or applied by any governmental authority.

"LLC" means Wisconsin Urgent Care Management, LLC, a Wisconsin limited liability company.

"LLC Minimum Gain" has the meaning ascribed to "partnership minimum gain" as set forth in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"Management Agreement" means the Management Agreement that may be entered into between the LLC and Provider Entity for the management of Urgent Care Centers or Occupational Health Clinics (including any HIPAA Business Associate Agreement between such parties arising therefrom).

"Managers" means the Board of Managers.

"Master Affiliation Agreement" means that certain Master Affiliation Agreement, dated as of November 4, 2019 by and between PIC Parent and Ministry.

"Member Intellectual Property" shall have the meaning set forth in Section 14.4.

"Member Nonrecourse Debt" has the meaning ascribed to "partner nonrecourse debt" as set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"Member Nonrecourse Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the LLC Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"Member Nonrecourse Deductions" has the meaning ascribed to "partner nonrecourse deductions" as set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"Members" means those persons set forth on Exhibit A attached hereto as may be hereafter amended, together with any additional Members admitted pursuant to the provisions of this Agreement.

"Membership Interest" means each Member's interest in the LLC, consisting of (i) the Financial Rights, (ii) the Governance Rights, and (iii) rights to assign the Financial Rights and Governance Rights.

"Ministry" shall have the meaning set forth in the preamble hereto.

"Ministry BSSA Termination" means the termination of the Billing and Support Services Agreement by Ministry on behalf of the LLC pursuant to Section 5.2(b) or Section 5.2(d) of the Billing and Support Services Agreement.

"Ministry Hired Employee" means any Ministry or Ministry Affiliate employee who is engaged by the LLC, PIC or a PIC Affiliate to provide services for the LLC pursuant to the Management Agreement or Billing and Support Services Agreement.

"Ministry Managers" shall have the meaning set forth in Section 7.2.

"Ministry Parent" means Ascension Health, a Missouri not-for-profit corporation and the sole member of Ministry.

"Ministry Restricted Business" shall have the meaning set forth in Section 14.1(a).

"Newco Member" shall have the meaning set forth in Section 12.1(c).

"Non-Acquiring Member" shall have the meaning set forth in Section 14.1(c).

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Treasury Regulations.

"Occupational Health Clinic" means any clinic or facility that provides medical services related to the promotion and maintenance of physical, mental and social well-being of workers in all occupations, including the diagnosis and treatment of work-related injuries.

"Officers" means the President, Secretary and any other officers who may be designated from time to time by the Board of Managers to manage the affairs of the LLC pursuant to the provisions of ARTICLE VIII of this Agreement.

"Operating Agreement" shall have the meaning set forth in Section 2.2.

"Operating Region" means the area encompassing the zip codes listed on Exhibit B hereto, as may be modified from time to time.

"Other Member" shall have the meaning set forth in Section 12.4(a).

"Parent" means any Entity owning more than 50% of the voting power of a Member, and shall be Ministry Parent, with respect to Ministry, and PIC Parent, with respect to PIC.

"Partnership Representative" shall have the meaning set forth in Section 11.1.

"Payment Default Termination" shall mean the termination of the Billing and Support Services Agreement by PIC pursuant to Section 5.2(e) of the Billing and Support Services Agreement, but solely to the extent such termination arises pursuant to Section 4.1(d) of the Billing and Support Services Agreement.

"Percentage Interest" means the percentage as set forth opposite such Member's name on Exhibit A hereto, as the same may be amended from time to time.

"Permitted Transfer" has the meaning set forth in Section 12.1(a).

"Permitted Transferee" means the recipient of Membership Units pursuant to a Permitted Transfer.

"Person" means any individual, partnership, corporation, trust, or other Entity.

"PIC" shall have the meaning set forth in the preamble hereto.

"PIC BSSA Termination" means the termination of the Billing and Support Services Agreement by PIC pursuant to Section 5.2(e) of the Billing and Support Services Agreement, but excluding a Payment Default Termination.

"PIC Managers" shall have the meaning set forth in Section 7.2.

"PIC Parent" means Physicians Immediate Care LLC, a Delaware limited liability company and the sole member of PIC.

"PIC Restricted Business" shall have the meaning set forth in Section 14.1(b).

"Profits" and "Losses" means, for each Fiscal Year, an amount equal to the LLC's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i) Any income of the LLC that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(ii) Any expenditures of the LLC described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(iii) In the event the Gross Asset Value of any LLC asset is adjusted pursuant to subparagraphs (ii) and (iii) of the definition of Gross Asset Value set forth herein, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv) Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(v) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of Depreciation set forth herein; and

(vi) To the extent an adjustment to the adjusted tax basis of any LLC asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the LLC, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii) Notwithstanding any other provision of this definition, any items which are specifically allocated pursuant to Sections 5.3 and 5.4 hereof shall not be taken into account in computing Profits or Losses.

The amounts of the items of LLC income, gain, loss or deduction available to be specially allocated pursuant to Sections 5.3 and 5.4 hereof shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (vii) hereof.

"Property" means all real and personal property acquired by or contributed to the LLC and any improvements thereto, and shall include both tangible and intangible property.

"Proposing Member" has the meaning set forth in Section 12.2(a).

"Provider Entity" means the entity providing professional services to Urgent Care Centers and Occupational Health Clinics managed by the LLC, which shall initially be PIC Wisconsin, S.C.

"Put Right" shall have the meaning set forth in Section 12.4(b).

"Qualified Appraiser" means an appraiser that is a nationally recognized independent qualified appraiser with which the LLC does not otherwise do business, that is knowledgeable with respect to Urgent Care Centers and Occupational Health Clinics and that is selected in accordance with the terms of this Agreement.

"Regulatory Allocations" shall have the meaning set forth in Section 5.4.

"Responsible Person" means any Member, Manager, manager, or Officer of the LLC.

"Restricted Solicitations" shall have the meaning set forth in Section 14.1(c).

"Securities Act" means the Securities Act of 1933, as amended, or any similar law then in effect.

"Securities Law Compliance" shall have the meaning set forth in Section 12.1(a).

"Transfer" means, as a noun, any voluntary or involuntary transfer, sale, assignment, exchange, lease, mortgage, charge, hypothecation, pledge or other conveyance or encumbrance, including any transfer by Law or otherwise and, as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, lease, mortgage, charge, hypothecate, pledge or otherwise to convey or encumber.

"Treasury Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time, including corresponding provision of succeeding regulations.

"Urgent Care Center" means any clinic or facility that provides ambulatory medical care, to include laboratory and x-ray capabilities, through immediate medical service outside of a hospital emergency department on a walk-in basis and with weekend and extended hours of operation, for the treatment of acute and chronic illness and injury.

1.2 Additional Terms. The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "**include**," "**includes**" and "**including**" shall be deemed to be followed by the phrase "**without limitation**." All references to Articles and Sections shall be deemed references to Articles and Sections of this Agreement, unless the context shall otherwise require. All references herein to Exhibits shall be deemed to be references to the Exhibit(s) attached to this Agreement. The terms "**this Agreement**," "**hereof**," "**hereunder**" and similar expressions refer to this Agreement as a whole and not to any particular Article or Section or other portion hereof and include any agreement supplemental hereto. The conjunction "**or**" shall be understood in its inclusive sense (and/or).

## ARTICLE II.
## ORGANIZATION

2.1 Formation. The LLC was formed by the filing of Articles of Organization with the Wisconsin Department of Financial Institutions on May 19, 2020.

2.2 Adoption of Agreement. The Members hereby adopt this Agreement as the operating agreement of the LLC as the term "**Operating Agreement**" is used in the Act, to set forth the rules, regulations and provisions regarding the management of the business of the LLC, the governance of the LLC, the conduct of its business and the rights and privileges of its members. All prior versions of this Agreement are void and of no further effect. In the event of any conflict between this Agreement and the provisions of the Act, the provisions of the Act shall control.

2.3 Name. The name of the LLC is Wisconsin Urgent Care Management, LLC. The LLC may adopt and conduct its business under such assumed or trade names as the Board may from time to time determine. The LLC shall file any assumed or fictitious name certificates as may be required to conduct business in any state.

2.4 Principal Place of Business. The registered agent and registered office of the LLC shall be Matthew R. Middendorf, 1700 W. Higgins Rd., Ste. 600, Des Plaines, IL 60018, or such other agent and office as the Board may, from time to time, determine. The principal executive office of the LLC shall be located at 1700 W. Higgins Rd., Ste. 600, Des Plaines, IL 60018, or such other place as the Board may, from time to time, determine.

## ARTICLE III.
## PURPOSE AND POWERS

3.1 Purposes. The purposes of the LLC shall be to develop, operate and manage Urgent Care Centers (and Occupational Health Clinics if determined by the Members) and to engage in any and all lawful business for which limited liability companies may be organized under the Act. Notwithstanding any provision to the contrary in this Agreement or the Act, or any other agreement related to the LLC, for so long as Ministry (or any Affiliate of the Ministry) is a Member, the LLC shall be operated and managed in accordance with, and in furtherance of, the charitable and community-based healthcare purposes, mission, vision and values of the Ministry of promoting health and providing or expanding access to health care services to the sick, injured, aged, disabled

and to the community at large and to engage in health education and promotion of wellness of the community at large.

3.2 Powers. The LLC may exercise all powers necessary or convenient to carry out its business and affairs and to effectuate the purposes set forth in Section 3.1 hereof, which may be legally exercised by limited liability companies under the Act.

## ARTICLE IV.
## CAPITAL

4.1 Membership Interests and Amendments to Exhibit A. Each Member shall have the Percentage Interest, and shall have made the Initial Capital Contribution, set forth opposite such Member's name on Exhibit A. The amounts shown on Exhibit A with respect to Percentage Interests shall be appropriately amended to reflect changes in such Percentage Interests as a result of admission of additional Members, any changes in the Membership of the LLC, assignments of Membership Interests, or adjustments to the Capital Accounts of each Member. Exhibit A also shall be amended from time to time to reflect any changes in the addresses of Members.

4.2 Additional Contributions. Subject to the provisions of Section 7.15, if the Managers determine that additional Capital Contributions are reasonably required from time to time, the Managers shall request the Members to make to the LLC additional Capital Contributions in proportion to their respective Percentage Interests, shall specify the amount of the Capital Contribution to be made by each Member, and shall state the date by which the Capital Contribution is due, which date shall not be less than thirty (30) days after the date the Members receive the request. No Member shall be required to make an additional Capital Contribution, provided that if a Member or Members elect not to make an additional Capital Contribution, the other Members shall have the right to contribute to the LLC the amount of cash that the noncontributing Member or Members fail to contribute. The Members shall have thirty (30) days from the date the Members receive the request in which to elect to make or not make an additional capital contribution. If any Member fails to make an additional Capital Contribution, an amount (the "**Capital Amount**") shall be calculated for each Member. The Capital Amount shall equal the sum of the additional Capital Contribution, if any, made by that Member and the fair market value of the Member's Membership Interest immediately prior to the date that the additional Capital Contributions are made. The Membership Interest of each Member will be adjusted to equal its Capital Amount divided by the fair market value of all of the Membership Interests immediately after the additional Capital Contributions have been made. For purposes of this Section 4.2, "**fair market value**" shall be determined by the unanimous consent of the Board or, if such unanimous consent cannot be obtained, by a Qualified Appraiser. The Qualified Appraiser shall be agreed upon by unanimous consent of the Members, and the cost of the Qualified Appraiser shall be borne equally by the Members. The decision of the Qualified Appraiser shall be final and binding upon both Members. The failure of a Member to act in good faith and cooperate fully to select a Qualified Appraiser within thirty (30) days from the date the Members receive the request shall result in the other Member selecting the Qualified Appraiser. Notwithstanding the foregoing, any adjustments pursuant to this Section shall in no event alter or affect the Governance Rights of the Members set forth herein or the appointment of the Board of Managers pursuant to Section 7.2, both of which shall remain in full force and effect.

4.3 No Interest or Right to Withdraw. No Member shall have the right to demand the return of, or otherwise withdraw, its contribution, or to receive any specific property of the LLC, except as specifically provided in this Agreement. No Member shall have the right to demand and receive property other than cash in return for its contributions. No interest shall be paid on Capital Contributions or on balances in the Capital Accounts.

## ARTICLE V.
## ALLOCATION OF INCOME AND LOSSES; CASH DISTRIBUTIONS

5.1 Capital Accounts. The LLC will maintain a Capital Account for each Member according to the rules of Treasury Regulations Section 1.704-1(B)(2)(iv). For this purpose, the LLC may, upon the occurrence of the events specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of such regulation and Treasury Regulation Section 1.704-1(b)(2)(iv)(g) to reflect a revaluation of LLC property.

5.2 Profits and Losses. For each Fiscal Year of the LLC, after adjusting each Member's Capital Account for all Capital Contributions and distributions during such Fiscal Year and all special allocations pursuant to Sections 5.3 and 5.4 hereof, all Profits and Losses (other than Profits and Losses specially allocation pursuant to Sections 5.3 and 5.4) shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be a positive or a negative balance) shall be equal to (i) the amount which would be distributed to such Member, determined as if the LLC were to liquidate all of its assets for the Gross Asset Value thereof and distribute the proceeds thereof (after payment of all LLC debts, liabilities and obligations) pursuant to Section 5.8, minus (ii) the sum of (A) such Member's share of LLC Minimum Gain and (b) such Member's share of Member Nonrecourse Minimum Gain.

5.3 Special Allocations. The following special allocations shall be made in the following order:

(a) Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this ARTICLE V, if there is a net decrease in LLC Minimum Gain during any LLC Fiscal Year, each Member shall be specially allocated items of LLC income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in LLC Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.3(a) is intended to comply with the minimum gain chargeback requirement in such Section of the Treasury Regulations and shall be interpreted consistently therewith.

(b) Member Minimum Gain Chargeback. Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this ARTICLE V, if there is a net decrease in Member Nonrecourse Minimum Gain attributable to a

Member Nonrecourse Debt during any LLC Fiscal Year, each Member who has a share of the Member Nonrecourse Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5), shall be specially allocated items of LLC income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.3(b) is intended to comply with the minimum gain chargeback requirement in such Section of the Treasury Regulations and shall be interpreted consistently therewith.

(c) Qualified Income Offset. Notwithstanding the above, any Member who unexpectedly receives an adjustment, allocation or distribution described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6), shall be allocated items of income or gain (including gross income if necessary) in an amount and manner sufficient to eliminate any deficit created in such Member's capital account (to the extent it exceeds such Partner's obligation to restore such deficit) as quickly as possible. The provisions of this Section 5.3(c) are intended to comply with the provisions of Treasury Regulations Section 1.704-1(b), including any amendments or successive regulations thereto and shall be so interpreted.

(d) Gross Income Allocation. In the event any Member has a deficit Capital Account at the end of any LLC Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore, if any, and (ii) the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of LLC income and gain in the amount of such excess as quickly as possible, provided that any allocations pursuant to this Section 5.3(d) shall be made if and only to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this ARTICLE V have been tentatively made as if this Section 5.3(d) and Section 5.3(c) hereof were not in the Agreement.

(e) Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year or other period shall be allocated among the Members in proportion to their Percentage Interests.

(f) Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(g) Code Section 754 Adjustment. To the extent an adjustment to the adjusted tax basis of any LLC asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts, as a result of a distribution to a Member in complete liquidations on interests the amount of such adjustment to

the Capital Accounts shall be treated as an item of gain (if such adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specifically allocated to the Members in accordance with their interests in the LLC in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Members to whom such distribution was made in the event that Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(h) Loss Limitations. The Losses allocated pursuant to Section 5.2 hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 5.2, the limitation set forth in this Section 5.3(h) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

(i) Allocations Relating to Taxable Issuance of Membership Interests. Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of an interest in the LLC to a Member (the "**Issuance Items**") shall be allocated among the Members so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each such Member if the Issuance Items had not been realized.

(j) Allocations Upon Liquidation. Upon liquidation of the LLC, Profits and Losses, or items thereof, shall, to the extent possible, be allocated among the Members so that all Member's Capital Accounts are in proportion to their Percentage Interests.

5.4 Curative Allocations. The allocations set forth in Sections 5.3(a) - (h) hereof (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of LLC income, gain, loss or deduction pursuant to this Section 5.4. Therefore, notwithstanding any other provision of this Section 5.4 (other than the Regulatory Allocations), the Board shall make such offsetting special allocations of LLC income, gain, loss or deduction in whatever manner they determine appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all LLC items were allocated pursuant to Sections 5.2, 5.3(i), and 5.5. In exercising their discretion under this Section 5.4, the Board shall take into account future Regulatory Allocations under Sections 5.3(a) and 5.3(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Section 5.3(e) and 5.3(f).

5.5 Other Allocation Rules.

(a) The Members are aware of the income tax consequences of the allocations made by this ARTICLE V and hereby agree to be bound by the provisions of this ARTICLE V in reporting their shares of LLC income and loss for income tax purposes.

(b) For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Board using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(c) Solely for purposes of determining a Member's proportionate share of the "**excess nonrecourse liabilities**" of the LLC within the meaning of Treasury Regulations Section 1.752 3(a)(3), the Members' interests in LLC Profits are in proportion to their Percentage Interests.

(d) To the extent permitted by Section 1.704-2(h)(3) of the Treasury Regulations, the Members shall endeavor not to treat distributions of cash as having been made from the proceeds of a Nonrecourse Liability or a Member Nonrecourse Debt.

5.6 <u>Tax Allocations; Code Section 704(c)</u>. In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the LLC shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the LLC for federal income tax purposes and its initial Gross Asset Value (computed in accordance with the definition of Gross Asset Value contained herein.

In the event the Gross Asset Value of any LLC asset is adjusted pursuant to the definition of Gross Asset Value hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the Members in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this <u>Section 5.6</u> are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provisions of this Agreement.

5.7 <u>Allocations of Profits, Losses and Distributions in Respect of Interest Transferred</u>. Except as provided in the immediately-following sentence, Profits and Losses allocable to any Member whose Membership Interest has been Assigned, in whole or in part, during any fiscal year, shall be allocated among the Persons who were the holders of such interests during such year in proportion to their respective holding periods, according to the books and records of the LLC, without separate determination of the results of LLC operations during such periods. Profits or Losses attributable to a sale or other disposition of all or any portion of the assets of the LLC shall be allocated to those Members who were Members at the time of the occurrence of the disposition giving rise to such Profits or Losses. Distributions of LLC assets in respect of the interest shall be made only to persons who, according to the books and records of the LLC, are the owners of such Membership Interest on a date selected by the Board, in its sole discretion. The Board and the LLC shall incur no liability for making distributions in accordance with the provisions of the preceding sentence whether or not the Board of the LLC has knowledge or notice of any transfer of ownership of any Membership Interest.

5.8 Distributions of Available Cash Flow. LLC shall make current distributions of Available Cash Flow as determined by the Board from time to time. Such distributions shall be made to the Members in accordance with their respective Percentage Interests, except as otherwise provided in Section 5.9 hereof.

5.9 Distributions Upon Liquidation.

(a) Upon liquidation of the LLC, the assets contributed by each Member ("**Contributed Assets**") shall be distributed to the Member that contributed them; provided that, in the event a Member's Contributed Assets were relocated to a new site, or were relocated to an existing site which contains Contributed Assets of more than one Member, such assets shall no longer be deemed to be that Member's Contributed Assets for purposes of this Section 5.9 and the Members will determine upon (or prior to) such relocation to which Member the relocated Contributed Assets will be assigned upon a liquidation. The Board shall make a recommendation to the Members regarding the assignment of such relocated Contributed Assets pursuant to a written action no later than thirty (30) days prior to the applicable relocation. All Contributed Assets shall be valued by a Qualified Appraiser selected by the Managers.

(b) With respect to any assets not contributed to the LLC, but developed or acquired by the LLC, post-formation of the LLC ("**De Novo Assets**"):

(i) in the event that the liquidation arises from a dissolution of the LLC pursuant to Section 13.2(iii) or (iv), if such dissolution arises (a) primarily due to the actions of Ministry (in the case of Section 13.2(iii)) or (b) due to the dissolution, insolvency or bankruptcy of Ministry (in the case of 13.2(iv)), then PIC shall have the option to retain all or any portion of the De Novo Assets upon a liquidation. If PIC elects to retain less than all of the De Novo Assets, Ministry shall have the option to retain all or any portion of the remaining De Novo Assets upon a liquidation;

(ii) except for a liquidation arising from a dissolution of the LLC pursuant to Section 13.2(v) or (vi), in all other events of a liquidation arising from the dissolution of the LLC, Ministry shall have the option to retain all or any portion of the De Novo Assets upon a liquidation. If Ministry elects to retain less than all of the De Novo Assets, PIC shall have the option to retain all or any portion of the remaining De Novo Assets upon a liquidation; and

(iii) in the event of a liquidation arising from a dissolution of the LLC pursuant to Section 13.2(v) or (vi), all De Novo Assets (unless sold by the LLC to a third party in connection with such liquidation by mutual agreement of the Members) shall be distributed in proportion to the positive Capital Account balances of all Members, after allocation of Profits or Losses for the year of the liquidation in accordance with Sections 5.2, 5.3 and 5.4.

(c) Any Member receiving Contributed Assets or De Novo Assets (other than pursuant to Section 5.9(b)(iii)) with an aggregate valuation exceeding such Member's proportion of the positive Capital Account balances of all Members shall be obligated to pay cash to the LLC equal to the amount of such excess. If, after the distribution of Contributed Assets and De Novo Assets and all required payments by Members pursuant to this Section 5.9(c) (if any), there is not

sufficient cash on hand to satisfy obligations to creditors, the Members shall pay cash in proportion to their respective Percentage Interests to satisfy such obligations.

(d) Any assets remaining after the distribution of the Contributed and De Novo Assets, and the payment of all LLC debts and obligations, shall be distributed in proportion to the positive Capital Account balances of all Members, after allocation of Profits or Losses for the year of the liquidation in accordance with Sections 5.2, 5.3 and 5.4.

(e) Except as expressly set forth above, the Members shall not be obligated to contribute cash or any other asset to the LLC to make up deficits in the Capital Account balances of Members either during the term of the LLC or upon liquidation. However, upon liquidation, the Member that retains such Contributed or De Novo Assets shall remit payment to the other Member in an amount equal to the product of the other Member's Percentage Interest multiplied by the fair market value of such Contributed or De Novo Assets, as determined by a Qualified Appraiser, of the retained assets.

5.10 Consequences of Distributions. Upon the determination to distribute, remit or pay funds in any manner expressly provided in this ARTICLE V, made in good faith, the Members shall incur no liability on account of such distribution, even though such distribution may have resulted in the LLC retaining insufficient funds for the operation of its business, which insufficiency resulted in loss to the LLC or necessitated the borrowing of funds by the LLC.

5.11 Modification. The Board of Managers, without the consent of the Members, shall modify the provisions of this ARTICLE V or any other provisions of this Agreement if, after consultation with qualified counsel, the Board determines that such modification is necessary to (a) cause the allocations contained in this ARTICLE V to have substantial economic effect or otherwise be respected for Federal Income Tax purposes under Section 704 of the Code; (b) cause the allocation of Profits and Losses to conform, in accordance with the requirements of Section 704 of the Code, to the distributions provided in Section 5.9; or (c) cause the provisions of the Agreement to comply with any applicable legislation, regulation or rule enacted, promulgated or amended after the date of this Agreement, which change is necessary to enable the LLC to carry out its purposes in the manner contemplated by this Agreement. Any such amendment shall be so as to cause the least significant deviation from the provisions of this Agreement as originally set forth.

## ARTICLE VI.
## RIGHTS AND DUTIES OF MEMBERS

6.1 Rights and Duties. The Members shall have such rights and duties as are provided in this Agreement and the Act.

6.2 Liability of Members. Except as otherwise set forth in the Act, the Members shall not be liable under a judgment, decree or order of a court, or in any manner, for a debt, obligation or liability of the LLC.

6.3 Annual Meetings. The Members shall hold an annual meeting at the date, time and place within the State of Wisconsin determined by the Board of Managers to elect the Board of Managers, to review the prior year's operations, to discuss operations for the coming year and to

take up such other matters as may be properly raised at the meeting. Written notice of the meeting stating the place, day and hour of the meeting shall be delivered not less than ten (10) nor more than sixty (60) days before the meeting. The business transacted at a meeting shall not be limited to the purposes stated in the notice of the meeting. Failure to hold an annual meeting will not invalidate any actions taken by the Members, the Board of Managers or the Officers.

6.4 Special Meetings. Any Member or Members holding, in the aggregate, not less than a twenty-five percent (25%) Percentage Interest or the Board of Managers may call a special meeting of the Members. The Person calling the meeting may designate any place within Wisconsin for any special meeting. Written notice stating the place, day and hour of the special meeting and the purpose or purposes for which the meeting is called shall be delivered not less than ten (10) nor more than sixty (60) days before the meeting.

6.5 Waiver of Notice. A Member may waive notice required by this ARTICLE VI or the Act either before or after a meeting by providing to the Secretary a written waiver which shall be placed in the LLC's records; provided, however, attendance by a Member at a meeting is a waiver of notice of that meeting, except where the Member objects at the beginning of the meeting to the transaction of business because the meeting is not lawfully called or convened, or objects before a vote on an item of business because the item may not lawfully be considered at that meeting and does not participate in the consideration of the item at that meeting.

6.6 Voting. Except as otherwise provided in this Agreement, each Member shall have voting rights equivalent to its percentage Governance Rights.

6.7 Quorum. A quorum shall be present at a meeting of the Members if all of the Members are represented at the meeting in Person or by proxy; provided, however, that if notice of a meeting of the Members is timely delivered as provided in Section 6.3 or 6.4 and such meeting is adjourned at least twice due to the absence of a quorum, thereafter a quorum shall be present at such meeting if Members holding at least a majority of the Governance Rights of the Members are represented at the meeting in Person or by proxy.

6.8 Action at Meetings. Unless otherwise provided by Law or this Agreement, the affirmative vote of Members holding a majority of the Governance Rights of the Members at a meeting at which a quorum is present shall constitute the act of the Members. At all meetings of the Members, a Member may vote by proxy executed in writing by the Member or by the Member's duly authorized attorney in fact. The proxy shall be filed with the Secretary before or at the time of the meeting. Any Member may demand that voting be by ballot. A Member may participate at any meeting by means of a communication device pursuant to which all Members participating may simultaneously hear each other.

6.9 Informal Action by Members. The Members may take any action without a meeting if a consent in writing, setting forth the action so taken and waiving the right to act at a meeting, is signed by Ministry and PIC.

6.10 Enforcement of Contracts between LLC and a Member. Notwithstanding any provision to the contrary in this Agreement, the Articles of Organization, or the Act:

(a) Ministry shall have the exclusive authority to make and/or take any action or decision regarding, and to pursue on the LLC's behalf, the exercise of any remedies and the enforcement of any rights of the LLC with respect to any breach, default or other noncompliance by PIC, PIC Parent, or any of their Affiliates (for purposes of this Section 6.10, any Provider Entity will be deemed an Affiliate of PIC) under any contracts or agreements between the LLC and PIC, PIC Parent, or their Affiliates (including, without limitation, the Billing and Support Services Agreement and any Management Agreement), including termination thereof by the LLC as a result of any breach, default or noncompliance by PIC, PIC Parent, or their Affiliates (or for any other reason permitted by the applicable contract or agreement other than without-cause termination or through notice of non-renewal). PIC is hereby required to abstain with regard to such decisions and the vote of Ministry shall constitute the action of the LLC for any decision or action with regard thereto.

(b) PIC shall have the exclusive authority to make and/or take any action or decision regarding, and to pursue on the LLC's behalf, the exercise of any remedies and the enforcement of any rights of the LLC with respect to any breach, default or other noncompliance by Ministry, Ministry Parent, or any of their Affiliates under any contracts or agreements between the LLC and Ministry, Ministry Parent, or their Affiliates, including termination thereof by the LLC as a result of any breach, default or noncompliance by Ministry, Ministry Parent, or their Affiliates (or for any other reason permitted by the applicable contract or agreement other than without-cause termination or through notice of non-renewal). Ministry is hereby required to abstain with regard to such decisions and the vote of PIC shall constitute the action of the LLC for any decision or action with regard thereto.

6.11 Powers Reserved to Ministry. Without the prior written consent or approval of Ministry, neither the Managers, the Officers nor any agent of the LLC may cause the LLC to take any action that implicates the *Ethical and Religious Directives for Catholic Health Care Services*, as determined by Ministry in its sole discretion, which decisions shall be reserved to the approval of Ministry.

6.12 Unanimous Member Approval. Neither the Board of Managers, the Officers, nor any agent of the LLC may cause the LLC to do any of the following, which decisions shall be reserved to the unanimous approval of the Members:

(a) voluntarily dissolve the LLC or voluntarily commence bankruptcy or insolvency proceedings;

(b) amend this Agreement, the Certificate of Formation of the LLC or the Articles of Organization of the LLC, except as set forth in Section 5.11;

(c) change the tax structure or the nature of the business or purpose of the LLC;

(d) issue or transfer any Membership Interests in the LLC or admit additional members in the LLC, except for Permitted Transfers (as defined in Section 12.1(a));

(e) merge or consolidate the LLC or any subsidiary with or into another entity;

(f) change the geographic scope of the Operating Region of the LLC for purposes of this Agreement;

(g) require any Member to endorse an LLC obligation as a guarantor, surety or otherwise; or

(h) change the method and/or frequency by which the LLC makes distributions pursuant to Section 5.8.

## ARTICLE VII.
## BOARD OF MANAGERS

7.1 General Powers and Duties. The LLC's business and affairs shall be managed by and be under the direction of its Board of Managers, subject to such limitations as are otherwise set forth in the Act or this Agreement. The Board of Managers may delegate such authority and responsibility as it deems to be in the best interests of the LLC to the Officers. A Manager need not be a resident of the State of Wisconsin. The Managers as such shall not receive any compensation for their services, but by resolution the Board of Managers may provide for reimbursement to Managers for all reasonable and necessary expenses incurred in attending meetings of the Board of Managers. When such expense may be determined in advance, the President may advance such amounts to respective Managers for that purpose upon request. Except as specifically set forth in this Agreement, any Manager may vote, or refrain from voting, for or against any matter pursuant to the terms of this Agreement, the Act or otherwise, in his or her sole and absolute discretion, considering such factors as he or she desires. Any duties or obligations imposed in this Agreement shall be interpreted so as to give full force and effect to this Section.

7.2 Number, Election and Term. Subject to Section 12.4, the Board of Managers shall consist of six (6) members: (i) three (3) Managers appointed by PIC (the "**PIC Managers**"), who shall initially be the individuals set forth on Exhibit C hereto and (ii) three (3) Managers appointed by Ministry (the "**Ministry Managers**"), who shall initially be the individuals set forth on Exhibit C hereto. All Managers shall serve for terms of one (1) year, or until their successor shall have been elected and qualified, or until the earlier of their death, removal, resignation or disqualification. Unless otherwise determined subject to Section 12.4 each annual meeting of the Members, each Member shall vote for three Managers suggested by Ministry and three Managers suggested by PIC.

7.3 Chairperson of the Board. The President of the LLC shall serve as the Chairperson of the Board of Managers.

7.4 Removal and Resignation. Only the Member that appointed a Manager may remove a Manager. A Manager may resign at any time by giving a written resignation to the President or the Secretary of the LLC. The resignation is effective without acceptance when such resignation is actually received by the President or Secretary unless a later effective time is specified in the resignation.

7.5 Vacancy. A vacancy created by removal, death, incapacity, resignation or an increase in the number of Managers or by any other reason may be filled only by appointment by

the Member which appointed such Manager. The individual appointed to fill a vacancy shall serve until the next annual meeting of the Members.

7.6 Meetings. Meetings of the Board of Managers shall be held at least semi-annually at the date, time and place determined by the Board of Managers. Special meetings of the Board of Managers may be called by the President, the Board of Managers or any Manager by giving two (2) days' notice to the Managers of the date, time, place and purpose of the special meeting. Participation at any meeting may be by any means of communication pursuant to which all Managers participating may simultaneously hear each other.

7.7 Waiver of Notice. A Manager may waive any notice required by this ARTICLE VII or the Act before or after the date and time stated in the notice. Except as set forth in the following sentence, the waiver must be in writing, signed by the Manager entitled to the notice and filed with the minutes or other records of the LLC. A Manager's attendance at or participation in a meeting waives any required notice to him of the meeting unless the Manager at the beginning of the meeting (or promptly upon his arrival) objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to any action taken at the meeting.

7.8 Quorum. The presence at a meeting of four (4) Managers shall constitute a quorum for such meeting, provided that at least two (2) Ministry Managers and at least two (2) PIC Managers are present. No Manager shall fail to attend a meeting for the purpose of defeating a quorum.

7.9 Action at Meetings. Unless otherwise provided by the Act or this Agreement, the affirmative vote of a majority of the Managers present at a meeting at which a quorum is present shall constitute the act of the Managers. The Board of Managers will work collaboratively to develop the annual operating budget for the LLC; provided, however, that such annual operating budget will be subject to PIC's final approval.

7.10 Informal Action by Managers. Any action may be taken without a meeting if a consent in writing, setting forth the action so taken and waiving the right to act at a meeting, is signed by at least four (4) Managers to include at least two (2) Ministry Managers and two (2) PIC Managers, unless such action requires, pursuant to the Act or this Agreement, the approval of a greater number of votes in which case the written consent must be executed by at least that greater number of Managers.

7.11 Board of Managers Committees. The Board of Managers, by written resolution, may establish committees having the authority of the Board of Managers in the management of the LLC's business. The resolution shall state the express authority granted to each committee and the manner in which each committee shall act. Each of the members of each committee must be a Manager. All procedures and provisions set forth herein with respect to the Board of Managers, including quorum and voting requirements, shall, to the extent relevant, apply equally to committees of the Board of Managers.

7.12 No Breach of Duty. No Member or member of the Board of Managers will violate a duty or obligation owed to the LLC merely because the conduct of the Member furthers its own

interest or the conduct of the member of the Board of Managers furthers the interest of the Member appointing such member of the Board of Managers.

7.13 Observation and Information Rights. Each Member shall have the following observation and information rights:

(a) Each Member's designee named from time to time ("**Designee**"), shall be entitled to consult with and advise management of the LLC on significant business issues, including management's proposed annual operating plans, and management will meet with Designee regularly during each year at the LLC's facilities at mutually agreeable times for such consultation and advice and to review progress in achieving said plans.

(b) Designee may examine the books and records of the LLC and inspect its facilities and may request information at reasonable times and intervals concerning the general status of the LLC's financial condition and operations, provided that access to highly confidential proprietary information and facilities need not be provided.

(c) The LLC shall, concurrently with delivery to the Board of Managers, give Designee copies of all notices, minutes, consents and other material that the LLC provides to its Managers, except that Designee may be excluded from access to any material or meeting or portion thereof if the Board of Managers determines in good faith, upon advice of counsel, that such exclusion is reasonably necessary to preserve the attorney-client privilege, to protect highly confidential proprietary information, or for other similar reasons. Upon reasonable notice and at a scheduled meeting of the Board or such other time, if any, as the Board may determine in its sole discretion, Designee may address the Board with respect to its respective Member's concerns regarding significant business issues facing the LLC.

(d) Any confidential information provided to or learned by Designee in connection with its observation rights shall be subject to the confidentiality provisions set forth herein.

(e) The rights described herein shall terminate and be of no further force or effect with respect to a Member upon (i) such time as no equity of the LLC is held by a Member or its affiliates; (ii) the consummation of the sale of the LLC's securities pursuant to a registration statement filed by the LLC under the Securities Act of 1933, as amended, in connection with the firm commitment underwritten offering of its securities to the general public; or (iii) the consummation of a merger or consolidation of the LLC that is effected (A) for independent business reasons unrelated to extinguishing such rights and (B) for purposes other than (1) the reincorporation or reorganization of the LLC in a different state or (2) the formation of a holding company that will be owned exclusively by the LLC's equity owners and will hold all of the outstanding equity of the LLC or its successor. The confidentiality obligations referenced herein will survive any such termination.

(f) Designee shall be entitled to receive the financial reports to be provided to each Member pursuant to Section 9.4.

7.14 Payer Strategy. The LLC shall cause the Company Clinics/Provider Entities to utilize the Ministry's commercial payor and managed Medicaid payor agreements for Company

Clinic services (including, but not limited to, the Ministry's workers' compensation payor agreements, if any), provided that the payors approve such use; and (ii) cause Company Clinics/Provider Entities to achieve clinical integration with Ministry in the Operating Region.

7.15 Unanimous Manager Approval. Subject to Section 6.10 above, neither the Board of Managers, the Officers, nor any agent of the LLC may cause the LLC to do any of the following, which decisions shall be reserved to the unanimous approval of the Board of Managers:

(a) waive the exclusivity and right of first refusal provisions set forth in Sections 12.2 and 14.1 below;

(b) cause the LLC or any approved subsidiary to redeem or purchase any Membership Interests;

(c) require additional Capital Contributions pursuant to Section 4.2;

(d) invest in or purchase a new Urgent Care Center or Occupational Health Clinic or other facility or business;

(e) materially change the scope of services provided by the LLC;

(f) purchase significant assets or make cash payments in excess of $100,000 per item if such amount is not included in the annual operating budget of the LLC;

(g) commence or settle litigation or claims against the LLC;

(h) sell assets of the LLC in excess of $100,000 (in one transaction or a series of related transactions) to an Independent Third Party;

(i) incur outstanding indebtedness in excess of $100,000 in the aggregate;

(j) enter into any transaction with (i) a Member or its Affiliate or (ii) any Person who is in a position to refer patients to any Urgent Care Center or Occupational Health Clinic managed by LLC;

(k) change the location of any Urgent Care Center or Occupational Health Clinic;

(l) amend in any material respect the: (i) Billing and Support Services Agreement (including the compensation payable to the PIC Parent thereunder); (ii) Management Agreement (including the compensation payable thereunder); or (iii) any sublease or equipment lease agreement by and between the LLC and any Provider Entity, Member or Affiliate of a Member; or

(m) sell or close any Urgent Care Center or Occupational Health Clinic.

## ARTICLE VIII.
## OFFICERS

8.1 Officer Designation. The LLC shall at all times have Officers acting as President and Secretary, and may have additional Officers as the Board of Managers may determine. Notwithstanding the foregoing or anything herein to the contrary, PIC shall appoint the President and Secretary.

8.2 Officer Election. Subject to Section 8.1 above, the Board of Managers shall elect the Officers at its initial meeting and at the annual meetings of the Board of Managers.

8.3 Term. The Officers shall hold office for a term of one (1) year or until their successors have been duly elected and qualified.

8.4 Removal. The Board of Managers may remove any Officer with or without cause and such removal shall be without prejudice to the contract rights, if any, of the Officer so removed.

8.5 Vacancies. A vacancy in any Officer position because of death, resignation, removal or any other cause may be filled by the Board of Managers for the unexpired portion of the term.

8.6 Duties of President. The President shall be the Chief Executive Officer of the LLC and shall have the responsibilities, duties, obligations, powers and authority prescribed by the Act for presidents or expressly delegated to him by the Board of Managers. He or she shall keep full and correct account of receipts and disbursements in the books belonging to the LLC, and shall deposit all moneys and other valuable effects in the name and to the credit of the LLC, in such banks as may be designated by the Board of Managers. He or she shall dispose of funds of the LLC as may be ordered by the Board of Managers, taking proper vouchers for such disbursements, and shall render to the Board of Managers, whenever they may require it of him or her, an account of all his or her transactions and of the financial condition of the LLC.

8.1 Duties of Secretary. The Secretary shall have the responsibilities, duties, obligations, powers and authority prescribed by the Act or the Board for the Secretary.

8.2 Qualifications. Officers need not be residents of the State of Wisconsin, and Officers need not be Managers or Members.

8.3 Compensation. Officers shall not receive any compensation for their services.

## ARTICLE IX.
## ACCOUNTING, BOOKS AND BANK ACCOUNTS

9.1 Accounting Period; Audit Cooperation. The annual accounting period of the LLC shall end on December 31. The LLC shall cooperate with the independent public accounting firm of each Member to timely provide the information necessary for the conduct of each Member's annual audit.

9.2 Books. Full and accurate records of all transactions of the LLC shall be kept by the Officers in proper books of account, computerized accounting systems or electronic data storage.

Said records shall be kept at all times in the principal executive office of the LLC or such other place as agreed upon by the Board of Managers. Each Member and Manager shall at all times have access to and may inspect any and all said records.

9.3 Bank Accounts. An account or accounts in the name of the LLC shall be maintained in such bank or banks as the Board of Managers may from time to time select. All monies and funds of the LLC, and all instruments for the payment of money to the LLC, shall, when received, be deposited in said bank account or accounts, or prudently invested in marketable securities or other negotiable instruments. All checks, drafts and orders upon said account or accounts shall be signed in the LLC's name by the President and such other Person or Persons as the Board of Managers may from time to time determine.

9.4 Reports and Financials.

(a) The LLC shall prepare and deliver to each Member the following:

(i) unaudited consolidated monthly balance sheets, income statements and statements of cash flow within thirty (30) calendar days following the end of each calendar month;

(ii) an annual budget, presented on a monthly basis, including a brief narrative explanation, approved in accordance with Section 7.9, prior to the beginning of the following Fiscal Year;

(iii) all material communications, written or otherwise, submitted to the LLC by any governmental or regulatory agency;

(iv) a monthly summary of the care coordination activities, pursuant to the Clinical Collaboration Agreement; and

(v) all such other information as the Members may reasonably request from time to time.

In addition, the LLC shall reasonably cooperate with each Member's respective accountants and advisors and provide necessary information to enable such Member to meet its year-end audit, reporting, and other obligations.

(b) PIC shall give prompt written notice to Ministry in the event PIC Parent engages in discussions of a potential Change in Control or sale of a material portion of PIC Parent.

## ARTICLE X.
## INDEMNIFICATION

10.1 Authority to Indemnify. The LLC shall indemnify an individual made a party to a proceeding, because such individual is or was a Responsible Person, against liability incurred in the proceeding if the Responsible Person satisfies the following standard of conduct: (a) the Responsible Person's conduct was in good faith and the Responsible Person reasonably believed (i) in the case of conduct in the Responsible Person's official capacity with the LLC, that his or

her conduct was in the best interest of the LLC or was consistent with the limitations set forth in this Agreement, and (ii) in all other cases, that his or her conduct was at least not opposed to the LLC's best interest or was consistent with the limitations set forth in this Agreement; (b) in the case of any criminal proceeding, the Responsible Person had no reasonable cause to believe his or her conduct was unlawful; or (c) the Responsible Person's conduct with respect to an employee benefit plan for a purpose he or she reasonably believed to be in the interests of the participants in and beneficiaries of the plan is conduct that satisfies Section 10.1. The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the Responsible Person did not satisfy the foregoing standard of conduct.

10.2 Limitations on Authority to Indemnify. Except as to court-ordered indemnification as provided in Section 10.5, the LLC may not indemnify a Responsible Person (i) in connection with a proceeding by or in the right of the LLC in which the Responsible Person was adjudged liable to the LLC, and (ii) in connection with any other proceeding charging improper personal benefit to such Responsible Person, whether or not involving action in the Responsible Person's official capacity, in which the Responsible Person was adjudged liable on the basis that personal benefit was improperly received by such Responsible Person. Further, the LLC may not indemnify a Member in connection with a proceeding by or in the right of the LLC against the Member or its Affiliate relating to an agreement between said Member or its Affiliate and the LLC.

10.3 Mandatory Indemnification. The LLC shall indemnify a Responsible Person who is or was wholly successful, on the merits or otherwise, in the defense of any proceeding to which such Responsible Person was a Party because he or she is or was a Responsible Person of the LLC against reasonable expenses incurred in connection with the proceeding.

10.4 Advances for Expenses. The LLC may advance, pay for or reimburse the reasonable expenses a Responsible Person who is a party to a proceeding in advance of final disposition of the proceeding if: (a) the Responsible Person furnishes to the LLC a written affirmation of his or her good faith belief that he or she has satisfied the standard of conduct set forth in Section 10.1; (b) the Responsible Person furnishes to the LLC a written undertaking (which shall be an unlimited general obligation of the Responsible Person but need not be secured and may be accepted by the LLC without reference to financial ability to repay), executed personally on his or her behalf, to repay the advance if it is ultimately determined that he or she is not entitled to indemnification; and (c) a determination is made that the facts then known to those making the determination would not preclude indemnification under this Section 10.4.

10.5 Court Ordered Indemnification. A Responsible Person of the LLC who is a party to a proceeding may apply for indemnification to the court conducting the proceeding or to another court of competent jurisdiction. On receipt of an application for indemnification, the court, after giving any notice the court considers necessary, may order indemnification if it determines: (a) the Responsible Person is entitled to mandatory indemnification as set forth in Section 10.3, in which case the court shall also order the LLC to pay the Responsible Person's reasonable expenses incurred to obtain court ordered indemnification; or (b) the Responsible Person is fairly and reasonably entitled to indemnification in view of all relevant circumstances, whether or not the Responsible Person has satisfied the standard of conduct set forth in Section 10.1 or was adjudged

liable as set forth in Section 10.2, but if adjudged so liable indemnification is limited to reasonable expenses incurred by the Responsible Person.

10.6 Determination and Authorization of Indemnification. Except as to court-ordered indemnification as provided in Section 10.5, the LLC may not indemnify a Responsible Person under Section 10.1 unless authorized in the specific case after a determination has been made that indemnification of the Responsible Person is permissible in the circumstances because the Responsible Person has satisfied the standard of conduct set forth in Section 10.1. The determination shall be made: (a) by the majority vote of a quorum of the Board of Managers consisting of Managers of the LLC who are not at the time parties to the proceeding; (b) if a quorum cannot be obtained under Section 10.6(a), by the majority vote of a committee duly designated by the Board of Managers (in which designation Managers at the time parties to the proceeding may participate), consisting solely of two (2) or more Managers not at the time parties to the proceeding; (c) by independent legal counsel (i) selected by the Board of Managers or by a committee in the manner set forth in Section 10.6(a) or (b), respectively; or (ii) if a quorum of the Board of Managers cannot be obtained under Section 10.6(a) and a committee cannot be designated under Section 10.6(b), selected by a majority vote of the full Board of Managers (in which selection Managers who are parties may participate); or (d) by the Members holding a majority of the Governance Rights, provided that the Governance Rights owned by or voted under the control of Members who are at the time parties to the proceeding may not vote on the determination.

Authorization of indemnification and evaluation as to reasonableness of expenses shall be made in the same manner as the determination that indemnification is permissible as provided in this Section 10.6, except that if the determination is made by special legal counsel, authorization of indemnification and evaluation as to reasonableness of expenses shall be made by those entitled under Section 10.6(c) to select special legal counsel.

10.7 Indemnification of Employees and Agents. The LLC may indemnify and advance expenses to an employee, independent contractor or agent of the LLC who is not a Responsible Person to the same extent as a Responsible Person. The LLC may also indemnify and advance expenses to an employee, independent contractor or agent who is not a Responsible Person to the extent consistent with public policy, as determined by specific action of the Board of Managers or by contract.

10.8 Insurance. The LLC may purchase and maintain insurance on behalf of an individual who is or was a Responsible Person, Officer, employee, independent contractor or agent of the LLC or who, while a Responsible Person, Officer, employee, independent contractor or agent of the LLC, is or was serving at the request of the LLC as a responsible Person, manager, employee, independent contractor, agent, partner or trustee of another foreign or domestic limited liability LLC, corporation, partnership, joint venture, trust, employee benefit plan, or other enterprise, against liability asserted against or incurred by such individual in that capacity or arising from such individual's status as a Responsible Person, Officer, employee, independent contractor or agent of the LLC whether or not the LLC would have the power to indemnify such individual against the same liability as provided in Sections 10.1, 10.2 or 10.3 hereof.

10.9 Nonexclusive Right. The indemnification and advancement of expenses granted pursuant to, or provided by this ARTICLE X shall not be deemed exclusive of any other rights to which a Responsible Person seeking indemnification or advancement of expenses may be entitled, whether contained in this ARTICLE X, the Articles of Organization of the LLC, in the Act, in a resolution of the Members, or an agreement providing for such indemnification; provided, however, that no indemnification may be made to or on behalf of any Responsible Person if a judgment or other final adjudication adverse to the Responsible Person establishes his or her liability: (a) for any breach of duty of loyalty to the LLC or its Members; (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; or (c) for any liability for wrongful distributions incurred under the Act.

Nothing in this Section 10.9 shall affect any rights to indemnification to which the LLC's personnel, other than Responsible Persons, may be entitled by contract or otherwise under law. This Section 10.9 does not limit the LLC's power to pay or reimburse expenses incurred by a Responsible Person in connection with his or her appearance as a witness in a proceeding at a time when he or she has not been named defendant or respondent to the proceeding.

10.10 Billing and Support Services Agreement and Management Agreement. Notwithstanding any provision contained herein to the contrary, the LLC shall not be required to indemnify PIC under this Agreement with respect to the Billing and Support Services Agreement and the Management Agreement, including but not limited to the performance by PIC of its obligations thereunder, any breach thereof or default thereunder, or any fraud, gross negligence or intentional misconduct of PIC with respect thereto. Subject to Section 6.10 of this Agreement, the rights and obligations of the parties with respect to the Billing and Support Services Agreement and the Management Agreement shall be set forth exclusively in the respective agreements, and neither party will have any claim against the other party with respect to the rights and obligations thereunder, except as expressly set forth therein.

## ARTICLE XI.
## TAX MATTERS

11.1 Tax Matters. PIC shall act as LLC's "partnership representative" as defined in Code Section 6233 (the "**Partnership Representative**"), and in such capacity shall be authorized and shall have the exclusive right to take any actions specified in Code Section 6233 and the Treasury Regulations thereunder; provided, that the Partnership Representative shall (a) take into consideration the relative costs and the tax consequences to the LLC and the Members (and their Affiliates) of making any election available to it, taking into account the tax-exempt status of the Ministry, and (b) use reasonable best efforts to ensure that the Ministry will not bear the economic burden of any imputed underpayment (including interest and penalties) that is not attributable to the Ministry. The Partnership Representative shall keep the Members informed of any material tax audit, claim or proceeding. The Partnership Representative shall exercise its powers only in accordance with this Agreement and shall act only as directed by the Board of Managers. The Partnership Representative shall notify each Member of the identity of any "designated individual" it names in its capacity as Partnership Representative and shall contractually require such designated individual to serve in such status only in accordance with the provisions of this Agreement (as if all provisions applicable to the Partnership Representative applied to the designated individual) and only in accordance with the directives of the Board of Managers.

11.2 Partnership for Tax Purposes Only. The Members have formed the LLC under the Act and expressly do not intend hereby to form a partnership (except insofar as the LLC may be treated as a partnership for tax purposes only). The Members do not intend to be partners to one another or partners as to any third party.

11.3 Withholding and Entity Taxes. Each Member hereby authorizes the LLC to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the LLC or any of its Affiliates with respect to such Member or as a result of such Member's Interest in the LLC (including, without limitation, any "imputed understatement" attributable to such Member and any amounts payable under Section 1446(f) of the Code). To the extent the LLC shall be required to withhold or pay any such taxes (including, without limitation, any "imputed understatement" attributable to such Member, any amounts payable under Section 1446(f) of the Code or any other amounts withheld from amounts payable to the LLC to the extent attributable, in the reasonable judgment of the Board of Managers, to such Member's interest in the LLC), such Member shall be deemed for all purposes of this Agreement to have received a payment from the LLC as of the time such withholding or tax is required to be paid, which payment shall be deemed to be a distribution with respect to such Member's interest in the LLC and shall reduce future distributions to such Member to the extent that the Member is then entitled to receive a distribution. To the extent that the aggregate of such payments made with respect to a Member for any period (together with actual distributions to such Member in such period), exceeds the distributions to which such Member is actually entitled for such period, such Member shall make a prompt payment of such excess to the LLC.

## ARTICLE XII.
## TRANSFER

12.1 Restriction on Transfer.

(a) No Member may make any Transfer of its Membership Interest, its Financial Rights or Governance Rights, or any portion thereof, other than a Permitted Transfer, unless said Transfer is both expressly permitted under the terms of this Agreement and is, in the opinion of counsel (reasonably acceptable to the Board of Managers), made pursuant to effective registration under applicable securities laws or pursuant to exemptions from such registration thereunder (such registration or exemption therefrom being sometimes referred to herein as "**Securities Law Compliance**"). Securities Law Compliance shall be required for each and every Transfer allowed under the terms of this Agreement, other than a Permitted Transfer, regardless of whether the section or sections permitting said Transfer expressly refers to Securities Law Compliance. Any Transfer or attempted Transfer by any Member in violation of this Agreement shall be null and void and of no force or effect whatever. Each Member hereby acknowledges the reasonableness of the restrictions on Transfer imposed by this Agreement in view of the LLC's purposes and the relationship of the Members. Accordingly, the restrictions on Transfer contained in this ARTICLE XII shall be specifically enforceable. Each Member hereby further agrees to hold the LLC and each Member (and each Member's successors and assigns) wholly and completely harmless from any cost, liability, or damage (including without limitation liabilities for income taxes and costs of enforcing this indemnity) incurred by any of such indemnified persons as a result of a Transfer or an attempted Transfer in violation of this Agreement. For purposes of this ARTICLE XII, a "**Permitted Transfer**" means a Transfer that consists of one of the following: (i)

a Transfer by an existing Member of the LLC to another existing Member of the LLC; (ii) a Transfer to the LLC; (iii) a Transfer by a Member to any Entity that wholly owns, is wholly owned by or is wholly owned by an Entity that also wholly owns such Member; and (iv) a Transfer approved by the unanimous consent of the Board of Managers; provided that a Permitted Transfer shall not include a Transfer (unless such transferee was, prior to such Permitted Transfer, a holder of Securities of the LLC) by any transferee of a Permitted Transfer.

(b) Notwithstanding anything to the contrary in this Agreement, a Member may not make a Transfer of its Membership Interests to a Permitted Transferee if such Transfer is undertaken in contemplation of or has the effect of avoiding the restrictions on Transfers in this Agreement (it being understood that the purpose of this Section 12.1(b) is to prohibit the Transfer of Membership Interests to a Permitted Transferee followed by a change in the relationship between the transferor and the Permitted Transferee (or a change of control of such transferor or Permitted Transferee) after the Transfer with the result and effect that the transferor has indirectly made a Transfer of Units by using a Permitted Transferee, which Transfer would not have been directly permitted under this Section 12.1 had such change in such relationship occurred prior to such Transfer).

(c) Each Member (i) that is a new company formed for the purpose of making an investment in the LLC or (ii) for which the ownership interest in the LLC constitutes a material portion of the assets of such Member (each, a "**Newco Member**") shall not permit any Transfer of equity securities of such Newco Member or the issuance of equity securities in such Newco Member to the extent such Transfer or issuance has as a purpose the avoidance of or is otherwise undertaken in contemplation of avoiding the restrictions on Transfers in this Agreement (it being understood that the purpose of this Section 12.1(c) is to prohibit the Transfer of equity securities of such Newco Member or issuances of equity securities in such Newco Member that has the result and effect that the Newco Member has indirectly made a Transfer or issuance that would not have been directly permitted as a Transfer under this Section 12.1).

(d) The LLC shall not recognize for any purpose any purported Transfer of all or part of a Membership Interest unless and until the other applicable provisions of this ARTICLE XII have been satisfied and the Board of Managers shall have received, on behalf of the LLC, a document (i) which has been executed by both the Member effecting the Transfer (or if the Transfer is on account of the liquidation of the transferor, its representative) and the Person to which the Membership Interest or part thereof is Transferred, (ii) which includes the notice address of the Person to be admitted to the LLC as a Member and such Person's agreement to be bound by this Agreement in respect of the Membership Interest or part thereof being obtained, (iii) which sets forth the Percentage Interest after the Transfer of the Member effecting the Transfer and the Person to which the Membership Interest or part thereof is Transferred, which together must total the Percentage Interest of the Member effecting the Transfer, and (iv) which contains a representation and warranty that the Transfer was made in accordance with all applicable Laws and regulations, including Securities Law Compliance and Healthcare Laws, and such other representations and warranties as the Board of Managers may require. Each Transfer and, if applicable, admission complying with the provisions of this ARTICLE XII is effective as of the first day of the calendar month immediately succeeding the month in which the Board of Managers receives the notification of Transfer and the other requirements of this ARTICLE XII have been met. The LLC may waive the requirements of this Section upon a vote of a majority of the Managers.

(e) The Member effecting a Transfer and any Person admitted to the LLC in connection therewith shall pay, or reimburse to the LLC, all costs incurred by the LLC in connection with the Transfer, including, without limitation, the legal fees incurred in connection with the legal opinions referred to in this Section 12.1, on or before the tenth (10th) day after receipt by that Person of the LLC's invoice for the amount due. If payment is not made by the date due, the Person owing the amount shall pay interest on the unpaid portion thereof from the date due until so paid at the highest rate of interest permitted by applicable law. The LLC may waive the requirements of this Section upon the vote of a majority the Managers.

12.2 Rights of First Refusal.

(a) Subject to the terms and conditions specified in this Section 12.2, including, but not limited to, the limitations set forth in Section 12.2(d), if a Member (for purposes of this Section 12.2, a "**Proposing Member**") desires to develop, acquire ownership of, manage, lease, operate or otherwise have a financial interest in a Clinic in the Operating Region, the Proposing Member shall first present the proposed transaction to the Board in reasonable detail, and the LLC shall have a right of first refusal to pursue such proposed transaction on the same terms and conditions as the Proposing Member. Such right may be exercised by the LLC by delivering written notice to the Proposing Member within forty-five (45) days following presentment of such proposed transaction by majority vote of the Managers other than those Managers appointed by the Proposing Member. In the event the LLC fails to timely exercise such right of first refusal, the Proposing Member may pursue such proposed transaction free and clear of any restrictions set forth in this Agreement. In the event the Proposing Member does not enter into definitive agreements with respect to such proposed transaction within forty-five (45) days following the expiration of the LLC's notice period set forth above, or such additional time as reasonably required, the proposed transaction shall once again become subject to the provisions of this Section 12.2(a).

(b) The entering into definitive agreements with respect to of any transaction pursuant to the exercise of a right of first refusal by the LLC under this Section 12.2 or by either Member under this Section 12.2 shall occur within forty-five (45) days following the delivery of written notice by the LLC or applicable Member, as applicable, of the exercise of such right of first refusal as required thereby.

(c) Each Member shall take all actions as may be reasonably necessary to consummate any sale contemplated by this Section 12.2 including, without limitation, entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

(d) Notwithstanding anything herein to the contrary, as to Ministry, in no event shall the restrictions and requirements set forth in this Section 12.2 be applicable to:

(i) any proposed Ascension Multi-Facility Transaction; or

(ii) any Occupational Health Clinic within the Operating Region that Ministry, directly or indirectly, through itself or any Ministry Affiliate(s), on its own or as a partner

with any Entity (whether through an agreement or otherwise in partnership) desires to develop, acquire ownership of, manage, lease, operate or otherwise have a financial interest in.

12.3 Involuntary Transfers and Defaults.

(a) If any Member (including without limitation any transferee pursuant to any Permitted Transfer): (i) becomes bankrupt, insolvent or files any debtor's proceedings, (ii) takes or has taken against it any proceeding of any kind under any provisions of any applicable bankruptcy or insolvency Law seeking any readjustment, arrangement, composition, postponement or reduction of debts, liabilities or obligations (in the case of an involuntary proceeding, which is not dismissed or removed within 60 days), (iii) is subject to any transfer of any interest in its Membership Interest by operation of Law (other than a Permitted Transfer), (iv) makes or attempts to make any Transfer of Membership Interest in violation of the provisions contained in this Agreement, (v) dissolves or ceases business operations, (vi) withdraws from the LLC without the unanimous consent of the other Member; (vii) is expelled from the LLC by judicial determination in accordance with the Act; (viii) materially breaches any of the covenants set out in Section 14.1 or Section 14.2 of this Agreement, which breach is not cured to the LLC's reasonable satisfaction within thirty (30) days of the LLC's delivery to such Member of written notice specifying such breach, or (ix) is or at any point becomes excluded, suspended, debarred or otherwise ineligible to participate in any Federal Healthcare Program (the occurrence of any of the foregoing events being referred to as a "**Default**"), the LLC shall have the option (which shall be assignable by the LLC) to purchase all or any portion of the Membership Interest owned by such Member in Default, in the manner provided in this Section 12.3. Such purchase option shall be without prejudice to any other right or remedy which the LLC or any other person may have under Law or pursuant to this Agreement.

(b) Any Member whose Membership Interest becomes subject to an option to purchase under this Section 12.3 shall be deemed to have delivered to the LLC a notice of offer (a "**Notice of Offer**") to sell all of said Member's Membership Interest as of the date of Default for a price equal to fifty percent (50%) of the fair market value of such Membership Interest after taking into account such Default. The fair market value of such Membership Interest shall, if the LLC elects to exercise its option hereunder, be determined by a Qualified Appraiser. Such Qualified Appraiser shall, within thirty (30) days of appointment, submit a notice of an appraisal of that value to the LLC and to the Member in Default. Such appraisal, the cost of which shall be borne by the LLC, shall include the consideration of marketability, minority ownership and other discounts that are usual and customary in the valuation process, as well as the restrictions on transfer specified in this Agreement.

(c) All other terms and conditions of the LLC's option to purchase under this Section 12.3 including, without limitation, the timing of such purchase (which shall take place promptly following the determination of the purchase price, taking into account any time reasonably necessary to obtain any governmental approvals), any right of the Members not in default to participate in such option to purchase and the payment of the purchase price for the Membership Interest of the defaulting Member in periodic installments over a period of not more than thirty-six (36) months, with interest thereon at the prime rate published in *The Wall Street Journal* on the date of the purchase of the Membership Interest, shall be determined by the LLC's

Board of Managers in good faith and shall include such other actions as the LLC may be required to take in order to comply with the other provisions of this Agreement.

12.4 Buy-Sell Provision. In the event of a (a) Deadlock, (b) Change in Control of PIC to either (i) any Person set forth on Exhibit D hereto (or such Person's successor(s) in interest through assignment, merger, sale, acquisition, license or otherwise) or (ii) any Person who Ministry determines, in Ministry's sole discretion and in good faith, operates such Person's own business or would operate the LLC, in a manner inconsistent with the *Ethical and Religious Directives for Catholic Health Care Services*, as promulgated by the local bishop and amended from time to time, (c) Change in Control of Ministry, (d) Buyout Event, (e) Ministry BSSA Termination or (f) PIC BSSA Termination (each, a "**Buy-Sell Trigger**"), the provisions of this Section 12.4 shall govern the procedures, rights and remedies of the Members and the Board. In the event of the occurrence of a Buyout Event or a Change in Control, the Member experiencing the occurrence of such Buyout Event or Change in Control shall deliver notice to the other Member of the occurrence of such Buyout Event or Change in Control (i) in the case of a Buyout Event, promptly upon the occurrence of such Buyout Event and (ii) in the case of a Change in Control, at least thirty (30) days prior to the occurrence of such Change in Control. In the event of the occurrence of any Buy-Sell Trigger:

(a) A Member (the "**Initiating Member**,") shall give written notice (the "**Buy-Sell Notice**") to the other Member (the "**Other Member**") regarding whether it intends to rely on this Section 12.4; provided that (i) in connection with a Buyout Event or a Change in Control, the Member experiencing such Buyout Event or Change in Control may not under any circumstances be the Initiating Member or give the Buy-Sell Notice, (ii) in connection with a Deadlock, either Member may be the Initiating Member or give the Buy-Sell Notice, (iii) in connection with a Ministry BSSA Termination, PIC may only be the Initiating Member if Ministry first informs PIC in its Buy-Sell Notice that it does not intend to exercise its Call Right and PIC subsequently informs Ministry that it intends to exercise its Put Right, otherwise PIC may not be the Initiating Member or give the Buy-Sell Notice; and (iv) in connection with a PIC BSSA Termination, Ministry may not under any circumstances be the Initiating Member or give the Buy-Sell Notice.

(b) The Initiating Member may either (i) acquire the Other Member's Membership Interest ("**Call Right**") or (ii) require the Other Member to buy all of the Initiating Member's Membership Interest ("**Put Right**"); provided, however, that upon a Ministry BSSA Termination, if Ministry first informs PIC in its Buy-Sell Notice that it does not intend to exercise its Call Right, then Ministry shall not have a Put Right, and, instead, PIC shall have a Put Right. If the Initiating Member desires to exercise either its Call Right or Put Right, it must deliver written notice of its intent to do so within forty-five (45) days of receipt of the Buy-Sell Notice. If the Initiating Member fails to deliver written notice of its intent to exercise its Call Right or Put Right within such timeframe, or if the Initiating Member notifies the Other Member that it waives its Call Right or Put Right, the Call Right and the Put Right, as applicable, shall be void and of no further effect. If the Initiating Member exercises its Call Right or Put Right as set forth in this Section 12.4, the sale price (if the Initiating Member exercises its Call Right) or purchase price (if the Initiating Member exercises its Put Right) shall be the fair market value of such Membership Interest as determined by a Qualified Appraiser selected by the Managers. Such Qualified Appraiser shall, within thirty (30) days of appointment, submit a notice of an appraisal of that value to the LLC. Such appraisal, the cost of which shall be borne by the LLC, shall include the

consideration of marketability, minority ownership and other discounts that are usual and customary in the valuation process, as well as the restrictions on transfer specified in this Agreement.

(c) Notwithstanding anything herein to the contrary:

(i) in the event of a Payment Default Termination where, immediately prior to the Payment Default Termination, (x) PIC was unwilling to or unable to fund its share of the additional Capital Contribution to the LLC to the extent necessary to address the shortfall in fees payable under the Billing and Support Services Agreement within a reasonable time period following Ministry's notice to PIC that Ministry agreed to fund its share of such additional Capital Contribution and was ready, willing and able to do so, or (y) the PIC Managers have voted against such additional Capital Contribution by the Members, Ministry shall either (i) acquire PIC's Membership Interest at a sale price equal to fair market value of such Membership Interest determined by a Qualified Appraiser selected by the Managers or (ii) elect to dissolve the LLC pursuant to Section 13.2(v) hereof. The terms of Section 12.4(b) with respect to an Initiating Member's Call Right shall govern Ministry's Call Right if exercised pursuant to this Section 12.4(c)(i). For the avoidance of doubt, Ministry shall not have a Put Right in the event of any such Payment Default Termination;

(ii) in the event of a Payment Default Termination where, immediately prior to the Payment Default Termination, (x) Ministry was unwilling to or unable to fund its share of the additional Capital Contribution to the LLC to the extent necessary to address the shortfall in fees payable under the Billing and Support Services Agreement within a reasonable time period following PIC's notice to Ministry that PIC agreed to fund its share of such additional Capital Contribution and was ready, willing and able to do so, or (y) the Ministry Managers have voted against such additional Capital Contribution by the Members, PIC shall either (i) acquire Ministry's Membership Interest at a sale price equal to fair market value of such Membership Interest determined by a Qualified Appraiser selected by the Managers or (ii) elect to dissolve the LLC pursuant to Section 13.2(vi) hereof. The terms of Section 12.4(b) with respect to an Initiating Member's Call Right shall govern PIC's Call Right if exercised pursuant to this Section 12.4(c)(ii). For the avoidance of doubt, PIC shall not have a Put Right in the event of any such Payment Default Termination; and

(iii) in the event of a Payment Default Termination where (x) both Members are unwilling to or unable to fund their respective shares of the additional Capital Contribution to the LLC to the extent necessary to address the shortfall in fees payable under the Billing and Support Services Agreement or (y) the PIC Managers and the Ministry Managers have voted against such additional Capital Contribution by the Members, then either Party will have the right to elect to dissolve the LLC pursuant to Section 13.2(v) or (vi) hereof, as applicable.

12.5 Additional Members. Except for Permitted Transfers, additional Persons may be admitted to the LLC as Members and Membership Interests may be created and issued only upon the unanimous approval of the Members.

## ARTICLE XIII.
## DISSOLUTION AND WINDING UP OF THE LLC'S EXISTENCE

13.1 Existence. The existence of the LLC shall be perpetual.

13.2 Dissolution. The LLC shall be dissolved upon the first to occur of the following:

(i) the unanimous written consent of the Board of Managers;

(ii) an event that makes it unlawful for all or substantially all of the business of the LLC to be continued upon notice to the LLC by a Member; provided that following notice to the LLC, either Member shall have the right to cause the LLC to cure such illegality if, in the opinion of nationally recognized healthcare counsel selected by such Member, such illegality is reasonably capable of being cured within a 120-day period following such notice and such illegality is so cured with such period, and (if so cured within such period) such cure shall be effective retroactively to the date of the event for purposes of this Section 13;

(iii) by order of a court with jurisdiction over the LLC;

(iv) in the event of a dissolution, insolvency or bankruptcy of either Member, in the event that the LLC does not exercise its option to purchase the Membership Interest pursuant to Section 12.3;

(v) at the election of Ministry, in the event of a Payment Default Termination under Section 12.4(c)(i) or, to the extent applicable, under Section 12.4(c)(iii); or

(vi) at the election of PIC, in the event of a Payment Default Termination under Section 12.4(c)(ii) or, to the extent applicable, under Section 12.4(c)(iii).

13.3 Distribution on Dissolution. Upon dissolution of the LLC, all LLC assets remaining after payment of LLC creditors shall be distributed to the Members in accordance with Section 5.9.

In the discretion of the Board, a pro-rata portion of the distributions that would otherwise be made to the Members may be:

(a) distributed to a trust established for the benefit of the Members for the purpose of liquidating LLC assets, collecting amounts owed to the LLC, and paying any contingent or unforeseen liabilities in connection with the LLC arising out of or in connection with the LLC. The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Board, in the same proportions as the amount distributed to such trust by the LLC would otherwise have been distributed to the Members under this Section 13.3 hereof; or

(b) withheld to provide a reasonable reserve for LLC liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the LLC, provided that such withheld amounts shall be distributed to the Members as soon as practicable.

## ARTICLE XIV.
## MEMBER COVENANTS

14.1 Exclusivity.

(a) Subject to the provisions of Section 12.2(a) and Section 12.2(d), without the prior written consent of PIC, Ministry agrees that, while it is a Member, and for a period of one (1) year following Ministry's termination as a Member for any reason, neither it nor its Affiliates shall partner with another operator of Urgent Care Centers with respect to the direct or indirect ownership, management, leasing, operation or development of any Urgent Care Centers, provide services to such business or provide lines of credit or other material financial support to such businesses (collectively, the "**Ministry Restricted Business**"), in each case within the Operating Region; provided, however, that nothing in this Section 14.1(a) will prohibit Ministry and its Affiliates from engaging in the Ministry Restricted Business following the dissolution and winding up of the LLC or the sale or termination of all or substantially all of the LLC's equity, assets or business; and provided further that, (i) if Ministry acquires PIC's Membership Interests pursuant to Section 12.4, then nothing in this Section 14.1(a) will prohibit Ministry and its Affiliates from engaging in the Ministry Restricted Businesses and (ii) if Ministry acquires any De Novo Assets, nothing in this Section 14.1(a) will prohibit Ministry and its Affiliates solely with respect to such De Novo Assets.

(b) Subject to the provisions of Section 12.2(a), without the prior written consent of Ministry, PIC agrees that, while it is a Member and for a period of one (1) year following PIC's termination as a Member for any reason, neither it nor its Affiliates shall partner with any other health system or provider with respect to the direct or indirect ownership, management, leasing, operation or development of any Clinics, provide services to such business or provide lines of credit or other material financial support to such businesses (collectively the "**PIC Restricted Business**"), in each case within the Operating Region; provided, however, that nothing in this Section 14.1(b) will prohibit PIC and its Affiliates from engaging in the PIC Restricted Business following the dissolution and winding up of the LLC or the sale or termination of all or substantially all of the LLC's equity, assets or business; and provided further that, (i) if PIC acquires Ministry's Membership Interests pursuant to Section 12.4, then nothing in this Section 14.1(a) will prohibit PIC and its Affiliates from engaging in the PIC Restricted Businesses and (ii) if PIC acquires any De Novo Assets, nothing in this Section 14.1(a) will prohibit PIC and its Affiliates solely with respect to such De Novo Assets.

(c) Without the prior written consent of the other Member, each Member agrees that, while it is a Member, and for a period of one (1) year following such Member's termination as a Member for any reason, neither it nor its Affiliates shall (i) solicit, hire or engage any individual working for any other Member or its Parent as an employee, independent contractor, consultant, agent or representative; or (ii) induce or attempt to influence any employee or contractor of a Member or its Parent, to terminate such employment or engagement (collectively, the "**Restricted Solicitations**"); provided, however, that if (i) in the event of a Call Right, the Initiating Member acquires the Other Member's Membership Interest or (ii) in the event of a Put Right, the Other Member acquires all of the Initiating Member's Membership Interest (the Initiating Member in (i) above and the Other Member in (ii) above, the "**Acquiring Member**"), then nothing in this Section 14.1(c) will prohibit such Acquiring Member and its Affiliates from

engaging in Restricted Solicitations solely with respect to employees, independent contractors, consultants, agents or representatives who are employed or contracted by the non-Acquiring Member (the "**Non-Acquiring Member**") or such Non-Acquiring Member's Affiliates and providing substantially all of their services solely on behalf of the LLC. Additionally, nothing in this Section 14.1(c) shall prohibit Ministry or a Ministry Affiliate from engaging any individual who was a Ministry Hired Employee but which employment or contractual arrangement was terminated by PIC or a PIC Affiliate for any reason. Moreover, each Member further agrees not to intentionally interfere with the other Member's vendor and payor contractual relationships; provided, however, that the foregoing shall not prohibit hires made pursuant to general advertisements for available positions.

(d) The Members agree that upon a violation of Section 14.1 by a Member, in addition to damages, the other Member and the LLC will be entitled to injunctive relief without proving actual damages or posting any bond. If a court shall hold that the duration and/or scope (geographic or otherwise) of the agreement contained in Section 14.1 is unreasonable, then, to the extent permitted by law, the court may prescribe a duration and/or scope (geographic or otherwise) that is reasonable and judicially enforceable. The Members agree to accept such determination, subject to their rights of appeal, which the Members hereto agree shall be substituted in place of any and every offensive part of Section 14.1, and as so modified, Section 14.1 shall be as fully enforceable as if set forth herein by the Members in the modified form. Each Member shall be responsible for any violation of this Section by its Affiliates.

(e) Notwithstanding anything to the contrary in this Section 14.1, in no event shall the restrictions and requirements set forth in this Section 14.1 be applicable to (i) Ascension Investment Management, LLC, a Missouri limited liability company, (ii) any Affiliate of Ministry that is exempt from federal taxation under Section 501(c)(3) of the Code and that functions as a hospital foundation, or any successor, (iii) Ascension Ventures, LLC, a Missouri limited liability company or any successor, (iv) any proposed Ascension Multi-Facility Transaction; or (v) any Urgent Care Center owned or operated by Ministry or any of its Affiliates (including such centers under development) as of the date of this Agreement, in any case, and neither Ministry nor any Affiliate thereof shall be required to cause such Entities to so comply or be liable for any failure to so comply with respect to such Entities.

14.2 Confidentiality. Each Member will hold in confidence, and not use to the detriment of the other Members, the LLC or the Entities owned or managed by the LLC, and will cause its representatives to hold in confidence, and not use to the detriment of the other Member, the LLC or any such Entity, any confidential or proprietary information it receives regarding the LLC, the other Member or the Entities owned or managed by the LLC. Failure to mark information as confidential or proprietary will not adversely affect its status as confidential or proprietary information. The obligations of the Members hereunder will not apply to the extent that (i) any such information was already known to such Member or disclosed to such Member by a third-party not known to be bound by a duty of confidentiality or such information becomes publicly available through no fault of such Member, or (ii) the disclosure of such information is required by applicable law; provided that as soon as practicable before such disclosure (if consistent with such applicable law), such Member will give the Person that owns such confidential or proprietary information prompt written notice of such disclosure to enable such Person to seek a protective order or otherwise preserve the confidentiality of such information. For purposes of this

Agreement, "**confidential or proprietary information**" shall mean any and all information, know-how and data, technical or non-technical, whether written, oral, electronic, graphic or otherwise of the LLC or other Member that is reasonably considered or treated as confidential and proprietary, and shall include, but not be limited to: (i) business methods; (ii) facilities and locations; (iii) billing policies, procedures, processes and records; (iv) tax returns and records; (v) any records, memoranda and correspondences dealing with the business of the LLC, the other Member or any Entity owned or managed by the LLC; (vi) financial, pricing and operational information, including all insurance records; (vii) internal memoranda, emails or correspondence; (viii) form agreements, checklists or pleadings; (ix) contracts or agreements executed by or on behalf of the LLC, the other Member or any Entity owned or managed by the LLC with any Person or Entity, including, but not limited to, hospitals, clinics, payors, health plans, accountable care organizations and medical practices or offices; (x) information regarding advantageous business relationships with hospitals, other facilities, clinics, payors, health plans, accountable care organizations and medical practices or offices; (xi) suppliers, marketing, and other information and know-how, all relating to or useful in the LLC's, the other Member's or an owned or managed Entity's business and which have not been disclosed to the general public; (xii) this Agreement and any agreements contemplated hereby; (xiii) operational and business systems, policies and procedures; (xiv) software and processes; (xv) systems design; (xvi) data analytics and algorithms; (xvii) business strategies; (xviii) business opportunities; (xix) customer lists and information; (xx) research and technical information; (xxi) outcomes and related data; and (xxiii) intellectual property, know-how and trade secrets.

14.3 Other Activities. Subject to the foregoing, the Members may have other business interests and may engage in other activities in addition to those relating to the LLC. Neither the LLC nor any Member shall have any right, solely by virtue of a Person's status as a Member, to share or participate in any other investments or activities of such other Member or to the income or proceeds derived therefrom. No Member shall incur any liability to the LLC or to any of the other Members as a result of engaging in any other business or venture unless such activities breach the provisions of this Agreement. Subject to Section 12.2 of this Agreement, without limiting the foregoing, no Member, solely as a result of his, her or its status as a Member, shall be obligated to offer any opportunity which it may have to engage in a business or venture or to purchase, lease or acquire any real or personal property, to the LLC or any other Members or to allow the LLC or such other Members to participate in any such business or venture, or to participate in any such purchase, lease or acquisition.

14.4 Ownership of Intellectual Property. From time to time, a Member may permit the LLC or one or more other Members to access or use Member Intellectual Property belonging to such Member in connection with the operation of the LLC. Unless otherwise provided in a license agreement with respect to such Member Intellectual Property: (i) neither the LLC nor any other Member may use such Member Intellectual Property other than in connection with the operation of the LLC; (ii) neither the LLC nor any other Member may sell, transfer, disclose or otherwise provide access to such Member Intellectual Property without the prior express written consent of the providing Member (with the exception that the LLC or any Member may allow access, on a need-to-know basis, to such Member Intellectual Property by the receiving Member's representatives, provided that such representatives are made aware of and agree to be bound by the restrictions set forth in this Section 14.4); (iii) on expiration or termination of this Agreement or the termination of the providing Member's Membership Interest in the LLC, the LLC and any

receiving Member shall, as directed by the providing Member (a) return to the providing Member the providing Member's Member Intellectual Property, including all copies thereof in any form, or (b) otherwise dispose of such Member Intellectual Property, including all copies thereof in any form; (iv) on the termination of the receiving Member's Membership Interest in the LLC, the receiving Member shall, as directed by the providing Member (a) return to the providing Member the providing Member's Member Intellectual Property, including all copies thereof in any form, or (b) otherwise dispose of such Member Intellectual Property, including all copies thereof in any form; (v) any Member Intellectual Property is provided "**as is**" without any warranties, express or implied; (vi) any Member Intellectual Property for which Ministry is the providing Member shall be used in a manner consistent with the *Ethical and Religious Directives for Catholic Health Care Services*, as determined by Ministry in its sole discretion, which decisions shall be reserved to the approval of Ministry; and (vii) all right, title and interest in and to such Member Intellectual Property, including any replication, copy, derivative or progeny thereof, including all intellectual property rights relating to any of the foregoing, shall be, and remain, vested in the providing Member. For purposes of this Section 14.4, "**Member Intellectual Property**" means intellectual property that was acquired, made, invented, developed, created, conceived or reduced to practice primarily by, or registered by, a Member, whether prior to or during the term of this Agreement, other than intellectual property developed jointly by two (2) or more Members and expressly agreed by such Members in writing to be joint intellectual property at the time of its invention, development, creation, conception or reduction to practice. Member Intellectual Property includes, with respect to each of the foregoing items, all rights in any patents or patent applications, copyrights, trade secret rights and other intellectual property rights relating thereto.

14.5 Compliance with Laws. The Members enter into this Agreement with the intent of conducting their relationship and the affairs of the LLC in full compliance with all applicable Laws, including Healthcare Laws. Notwithstanding any unanticipated effect of any of the provisions of this Agreement, no Member will intentionally conduct itself under the terms of this Agreement in a manner that would constitute a violation of applicable Laws, including Healthcare Laws. The LLC and each Member shall advise each other Person acting for or on behalf of the LLC or a Member of the obligations hereunder and shall use its best efforts to ensure that no such Person intentionally conducts himself, herself or itself on behalf of the LLC or such Member in a manner that would constitute a violation of applicable Laws, including Healthcare Laws. Nothing contained in this Agreement will require (directly or indirectly, explicitly or implicitly) any Member or Affiliate of any Member to refer or direct any patients or other business to the LLC, any Clinic owned or managed by the LLC, or any Member or direct or indirect owner of a Member, or to use any Clinic or the facilities of any Member as a precondition to receiving the benefits set forth in this Agreement or distributions under this Agreement. The Members will perform their obligations under this Agreement in accordance with the terms hereof. Any agreements between the LLC and any Member or Affiliate of a Member will be in writing, and the Members to any such agreement will perform their obligations under such agreement only in accordance with the terms thereof.

14.6 Ethical and Religious Directives; Antidiscrimination. The LLC and the Company Clinics shall be operated consistently with the Ethical and Religious Directives for Catholic Health Care Services as published and amended from time to time by the United States Conference of Catholic Bishops, and promulgated by the local bishop. The LLC will not, and the Billing and Support Services Agreement and Management Agreement will provide that no individual or Entity

rendering services at the Company Clinics may, discriminate or differentiate with respect to any patient, visitor or employee based on sex, marital status, age, race, color, disability, religion or otherwise, including by reason of the fact that the individual is a federal or state health care program beneficiary.

14.7 Operations in a Manner Consistent with Charitable Purposes. The LLC shall operate its business in a manner so as not to jeopardize the tax-exempt status of Ministry or any of its Affiliates, as organizations described in Section 501(c)(3) of the Code. In the event that any law or regulation now existing or enacted or promulgated after the effective date of this Agreement is interpreted by judicial decision, by regulatory agency, or by the reasonable written opinion of Ministry's legal counsel in such a manner as to indicate that the continued ownership interest of Ministry in the LLC will jeopardize the tax-exempt status of Ministry or any of its Affiliates, the Members shall discuss in good faith amending this Agreement as necessary to comply with such law or regulation. To the maximum extent possible, any such amendment shall preserve the underlying economic, financial, and governance arrangements between the Members. Notwithstanding any other provision to the contrary, each Member may elect to enter into (or not enter into) any such amendment in its sole and absolute discretion. The Members shall cause each Company Clinic to: (i) establish and maintain reasonable financial assistance policies; and (ii) provide reasonable levels of charity care as appropriate.

## ARTICLE XV.
## GENERAL PROVISIONS

15.1 Notices. All notices, consents, waivers, directions, requests, votes or other instruments or all notices, offers, requests, demands, and other communications pursuant to this Agreement shall be given in writing, by personal delivery, by prepaid first class registered or certified mail property addressed with an appropriate postage paid thereon, by electronic transmission, facsimile transmission, or by UPS, FedEx or other recognized, reputable overnight courier and shall be deemed to be duly given and received on the date of delivery if delivered personally, on the second day after the deposit in the United States Mail if mailed, upon acknowledgment of receipt of electronic transmission if sent by electronic transmission or facsimile transmission, or upon delivery if by UPS, FedEx or other recognized, reputable overnight courier. Notices shall be sent to the parties at the following address:

(a) in the case of the LLC, to its principal office;

(b) in the case of a Manager, to his business or residential address as on record with the LLC; and

(c) in the case of any Member, to the address set forth on Exhibit A; or to such address as any Member may specify in writing to the LLC.

15.2 Integration. This Agreement embodies the entire agreement and understanding among the Members and supersedes all prior agreements and understandings, if any, among and between the Members relating to the subject matter hereof.

15.3 Applicable Law. This Agreement and the rights of the Members shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

15.4 Severability. In case any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and any other application thereof shall not in any way be affected or impaired thereby.

15.5 Binding Effect. Except as herein otherwise provided to the contrary, this Agreement shall be binding upon, and inure to the benefit of, the Members and their respective heirs, executors, administrators, successors, transferees and assigns.

15.6 Enforcement. In the event any Member hereto fails to perform any of its obligations under this Agreement or in the event a dispute arises concerning the meaning or interpretation of any provision of this Agreement, the defaulting Member or the Member not prevailing in such dispute, as the case may be, shall pay any and all costs and expenses incurred by the other Member in enforcing or establishing their rights hereunder, including, without limitation, court costs and reasonable attorneys' fees.

15.7 Amendment. Except as otherwise provided in Section 5.11, this Agreement may only be amended, modified, or supplemented upon the unanimous approval of all Members.

15.8 Compliance with Laws. The LLC and the Members and their respective Affiliates shall at all times comply with all applicable Healthcare Laws.

15.9 Referrals. The LLC and the Members and their respective Affiliates shall not make any payment, or offer to make any payment, whether cash or in kind, to any physician, hospital, facility, Entity, or individual in order to induce the referral of patients or other items or services to any Urgent Care Center(s) or Occupational Health Clinic(s) operated by the LLC under the terms of this Agreement. Further, nothing in this Agreement shall be construed to require the LLC, any physician or any other health care provider retained or employed by it to refer patients to the Ministry Parent or utilize the Ministry Parent to provide inpatient, outpatient or other services to patients or otherwise generate business for the Ministry Parent.

15.10 Federal Health Care Programs. In entering into this Agreement, each Member respectively certifies that it is not currently excluded, suspended, debarred, or otherwise ineligible to participate in Federal Health Care Programs; that it has not been convicted of a criminal offense related to the provision of health care items or services; nor has it been reinstated to participation in Federal Health Care Programs after a period of exclusion, suspension, debarment, or ineligibility.

IN WITNESS WHEREOF, this Agreement is executed effective as of the date first set forth above.

**WISCONSIN URGENT CARE MANAGEMENT, LLC**

By: ______________________________
Name: Matthew Middendorf
Title: Secretary

IN WITNESS WHEREOF, this Agreement is executed effective as of the date first set forth above.

**PIC MANAGEMENT HOLDING COMPANY OF WISCONSIN, LLC**

By: ______________________
Name: Stanley Blaylock
Title: President

IN WITNESS WHEREOF, this Agreement is executed effective as of the date first set forth above.

**COLUMBIA ST. MARY'S, INC.**

By: ______________________________
Name: Bernie Sherry
Title: Ministry Market Executive



Case 2:25-cv-00173-SCD Filed 03/27/25 Page 50 of 54 Document 13-1

## EXHIBIT A

**Members, Initial Percentage Interests and Initial Capital Contributions**

| Member Name and Address | Initial Capital Contribution | Initial Financial Rights | Initial Governance Rights | Initial Percentage Interest |
|---|---|---|---|---|
| Columbia St. Mary's, Inc.<br>c/o. Bernie Sherry<br>Ministry Market Executive<br>400 W. River Woods Parkway, Glendale, WI 53212 | $1,208,101.00 | (50%) | (50%) | (50%) |
| PIC Management Holding Company of Wisconsin, LLC<br>c/o Stanley B. Blaylock<br>1700 W. Higgins Rd., Ste. 600, Des Plaines, IL 60018 | $1,208,101.00 | (50%) | (50%) | (50%) |

## EXHIBIT B

## Operating Region

The Operating Region shall be the area encompassing the following Wisconsin zip codes:

**Mt. Pleasant:**
53403
53404
53405
53406

**South Milwaukee:**
53110
53154
53172

**Brookfield:**
53005
53045
53122
53186

# EXHIBIT C

## Initial LLC Board of Managers

| | |
|---|---|
| Ministry Managers: | Greg Brusko, MD<br>Corey Ridgway<br>Jon Sohn |
| PIC Managers: | Stanley B. Blaylock<br>Matthew R. Middendorf<br>Kathy Peters |

# EXHIBIT D

## Direct Competitors of Ministry

Any entity owned, controlled by, or otherwise affiliated with Advocate/Aurora Healthcare, Aspirus, Children's Hospital of Wisconsin, Concentra, Hospital Sisters Health System, Prevea, ProHealth Care, Thedacare, SSM Health (including Agnesian), ProHealth/Medical Associates, Marshfield Clinic, the Medical College of Wisconsin and/or Froedtert, and each of the above organization's subsidiaries, affiliates and/or successors, combined and/or merged organizations.

Ascension National Competitors

Health Systems

- CHS
- Tenet
- HCA

Payers

- Humana
- Aetna/CVS
- United Health Group/Optum

Other

- Amazon/Haven Healthcare