# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**PIC MANAGEMENT HOLDING
COMPANY OF WISCONSIN, LLC** and
**PHYSICIANS IMMEDIATE CARE, LLC,**

    Plaintiffs,

    v.                                                      Case No. 25-CV-173-SCD

**COLUMBIA ST. MARY'S, INC.** and
**ASCENSION HEALTH**

    Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

    PIC-Wisconsin (a subsidiary of PIC) and Columbia St. Mary's Inc. (Ministry) (a subsidiary of Ascension Health)—all healthcare management companies—created a joint venture to operate several Milwaukee-area urgent care facilities. *See* ECF No. 13 ¶¶ 1, 4. When the Joint Venture started struggling financially, PIC began sending the Joint Venture cash infusions to cover its operating losses. *Id.* ¶ 5–6. In this lawsuit, plaintiffs now assert that the defendants violated the parties' operating agreement and their duty of good faith when they sat idly by while PIC was valiantly trying to rescue the venture with these cash infusions. The defendants have moved to dismiss several of the claims. For the reasons stated below, I will grant the defendants' motion to dismiss counts 1, 4, and 6, and to limit count 5.

### BACKGROUND

All joint ventures begin with high hopes. According to the amended complaint, Ministry and PIC-Wisconsin executed an Operating Agreement to form a Joint Venture that would manage four Milwaukee-area urgent care facilities.[1] ECF No. 13 ¶¶ 1, 27–28; ECF No. 17 at 5. PIC, which wholly owns PIC-Wisconsin, separately contracted to provide administrative services to the Joint Venture. *See* ECF No. 13 ¶ 2–3; ECF No. 13-2. Although initially successful, by 2022 any high hopes for the venture's success dwindled in tandem with the venture's financial health. Operating losses piled up. ECF No. 13 ¶¶ 5, 40. Plaintiff PIC, "as the overseer of the accounts," began sending the Joint Venture cash infusions to cover its losses. *Id.* ¶¶ 3, 6. These cash infusions didn't save the Joint Venture. *See id.* ¶ 1. Now, PIC would like to be reimbursed by the defendants. *See id.* ¶¶ 3, 14, 68.

In financial statements and presentations to the Joint Venture's board of managers, PIC reported the cash infusions as a "deferred management fee" or "intercompany payable to PIC" in bright red font. ECF No. 13 ¶¶ 8–10. According to PIC-Wisconsin, Ministry should have known from these reports that the Joint Venture had been taking on water, that PIC was bailing it out, and that Ministry would eventually need to split the repair bill. *Id.* ¶¶ 74–75; *see* ECF No. 21 at 1. Instead, PIC-Wisconsin claims that Ministry sat idly by and remained silent while PIC-Wisconsin pumped in cash to rescue the venture. Finally, in October 2023, an officer from PIC's parent company "issued a formal request for a capital call in accordance with the terms of the Operating Agreement." ECF No. 13 ¶ 82; ECF No. 17 at 5. Negotiations stalled and then broke down, interfering with the Joint Venture's ability to dissolve and address the venture's ongoing lease obligations. *See* ECF No. 13 ¶¶ 68, 85–106.

---

[1] Although many of these terms are not proper nouns, I will follow the parties' practice of capitalizing them.

After negotiations failed, PIC-Wisconsin sued Ministry and Ascension in federal court. ECF No. 1. The clerk of court randomly assigned the case to me. The defendants filed a motion to dismiss. ECF No. 9. PIC-Wisconsin then filed an amended complaint, adding PIC as a plaintiff and including two new counts. *See* ECF No. 13. PIC-Wisconsin and PIC charge six counts in their amended complaint: (1) breach of the Operating Agreement (PIC-Wisconsin v. Ministry); (2) breach of the South Milwaukee Guaranty (PIC v. Ministry); (3) breach of the Mount Pleasant Guaranty (PIC v. Ministry); (4) unjust enrichment (both plaintiffs v. both defendants); (5) repudiation (both plaintiffs v. both defendants); and (6) quantum meruit (both plaintiffs v. both defendants). Ministry and Ascension filed a motion to dismiss counts 1, 4, and 6 for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and to limit the scope of count 5. ECF No. 17. All parties consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), *see* ECF Nos. 4, 11, 15.

**MOTION TO DISMISS STANDARD**

A motion to dismiss under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive a motion to dismiss, "a complaint must 'contain sufficient factual matter . . . to state a claim to relief that is plausible on its face.'" *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "To analyze the sufficiency of a complaint [courts] must construe it in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in the plaintiff's favor." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). The court also

considers exhibits attached to the complaint. Fed. R. Civ. P. 10(c). If documents attached to a complaint contradict the allegations of the complaint, the document controls. *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454–55 (7th Cir. 1998).

## DISCUSSION

Ministry and Ascension move to dismiss counts 1, 4, and 6, and to limit the reach of count 5. I will address count 1's breach of contract claim, next count 5's repudiation claim, and finally count 4 and count 6's equity claims. For reference, key terms of the Operating Agreement are quoted below.

> **§ 4.2 Additional Contributions**. [I]f the Managers determine that additional Capital Contributions are reasonably required from time to time, the Managers shall request the Members to make to the LLC additional Capital Contributions in proportion to their respective Percentage Interests, shall specify the amount of the Capital Contribution to be made by each Member, and shall state the date by which the Capital Contribution is due, which date shall not be less than thirty (30) days after the date the Members receive the request.
> No Member shall be required to make an additional Capital Contribution, provided that if a Member or Members elect not to make an additional Capital Contribution, the other Members shall have the right to contribute to the LLC the amount of cash that the noncontributing Member or Members fail to contribute. The Members shall have thirty (30) days from the date the Members receive the request in which to elect to make or not make an additional capital contribution.
>
> **§ 6.2 Liability of Members.** Except as otherwise set forth in the Act, the Members shall not be liable under a judgment, decree or order of a court, or in any manner, for a debt, obligation or liability of the LLC.
>
> **§ 7.15 Unanimous Manager Approval.** Subject to Section 6.10 above, neither the Board of Managers, the Officers, nor any agent of the LLC may cause the LLC to do any of the following, which decisions shall be reserved to the unanimous approval of the Board of Managers: …
>
> (c) require additional Capital Contributions pursuant to Section 4.2;
>
> (i) incur outstanding indebtedness in excess of $100,000 in the aggregate;
>
> (j) enter into any transaction with … a Member or its Affiliate[.]

ECF No. 13-1 (formatted for readability).

## I. Breach of Contract / Duty of Good Faith

In count 1, PIC-Wisconsin alleges Ministry breached the Operating Agreement by sitting on its hands and failing to contribute money to the Joint Venture as its finances went downhill. Although PIC-Wisconsin invokes the Operating Agreement, it hasn't cited any provision of the agreement that would have required Ministry to make the financial contributions it now believes were due. In fact, it concedes that the agreement is "silent" as to whether a member can "sit idly by and let the other member bear the burden of keeping the joint venture alive." ECF No. 21 at 12. Instead, plaintiffs believe the implied covenant of good faith and fair dealing required Ministry to match (or to reimburse an appropriate share of) their contributions. *See* ECF No. 13 ¶¶ 115–19. For its part, Ministry says that the contract did not require it to contribute financially, and in fact the agreement specifically allowed it *not* to contribute under these circumstances.

Delaware law applies to this claim.[2] The term "good faith" is "best understood as a way of implying terms in the agreement," when unanticipated developments arise after the fact. *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 441 (Del. 2005). "Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty...unattached to the underlying legal document.'" *Id.*

---

[2] Under the Operating Agreement, the "Agreement and the rights of the Members shall be governed by and construed and enforced in accordance with the laws of the State of Delaware." ECF No. 31-1 at 46. Wisconsin generally recognizes parties' freedom to contract for choice of law, Drinkwater v. Am. Fam. Mut. Ins. Co., 2006 WI 56, ¶ 25, but contracting parties cannot "use their freedom to escape 'important public policies of a state whose law would be applicable if the parties['] choice of law provision were disregarded.'" Am. Fam. Mut. Ins. Co. v. Cintas Corp. No. 2, 2018 WI 81, ¶ 13 (quoting Bush v. Nat'l Sch. Studios, Inc., 407 N.W.2d 883, 886 (Wis. 1987)). Here, neither party raised public policies in Wisconsin that would be undermined should I enforce the Operating Agreement's choice-of-law provision, so I will apply Delaware law. *See* ECF No. 17 at 8; ECF No. 21 at 5–6.

(quoting *Glenfed Fin. Corp., Com. Fin. Div. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. Super. Ct. App. Div. 1994)).

The plaintiffs' dependence on implied duties of good faith and fair dealing is misplaced. Delaware courts make clear that reliance on the implied covenants of good faith and fair dealing is a "cautious enterprise," *Nemec v. Schrader*, 991 A.2d 1120, 1125 (Del. 2010), only to be invoked when a gap in the contract fails to address an unanticipated situation. Otherwise, courts run the risk of granting contractual rights to a party that the party proved unable to obtain at the bargaining table. *Aspen Advisors LLC v. United Artists Theatre Co.,* 843 A.2d 697, 707 (Del.Ch.), aff'd, 861 A.2d 1251 (Del. 2004). Here, the plaintiffs believe there is a gap in the contract because it does not address what obligations exist when one member decides to fund the enterprise and the other opts not to. Assuming such a gap exists, it is not the sort of gap that should be filled by implied covenants. The implied covenants come into play "only where the parties to the contract did not anticipate some contingency, and had they thought of it, the parties would have agreed at the time of contracting to create that obligation." *Am. Cap. Acquisition Partners, LLC v. LPL Holdings, Inc.,* No. CIV.A. 8490-VCG, 2014 WL 354496, at *5 (Del. Ch. Feb. 3, 2014). Here, the possibility that the venture might have financial difficulty was hardly something the parties could not anticipate. Using implied covenants to supply a term under these circumstances would therefore insert the court into the business of creating obligations that could readily have been negotiated. It could also undermine, rather than enforce, the parties' original expectations. *Id.* ("Because the implied covenant of good faith and fair dealing serves only a gap-filling function, and the Plaintiffs do not allege that the parties failed to anticipate the need for technological adaptations, this portion of the implied covenant count must be dismissed.").

The plaintiffs' proposition also ignores the fact that the implied covenants of the law must remain agnostic as to decisions that are essentially nothing more than business judgments. As far as the law is concerned, the decision to fund a given venture is not entitled to any higher "moral" status than the decision *not* to fund. After all, many fortunes have been lost by sending good money after bad, and so it can hardly be said to be "bad faith" if one side decides not to continue funding a venture when it has no apparent contractual obligation to do so. The point is that the decision to fund or not fund is not so clear-cut that any implied covenant should place its thumb on the scale either way. The same goes for plaintiffs' suggestion that the reluctant, non-contributing member has some kind of obligation to speak out and inform the contributing member that it will not be making contributions. Unless there is something inherently offensive about the decision not to contribute—which there is not, given that it is simply a matter of business judgment—why would an implied duty step in and impose some kind of affirmative duty to communicate?

PIC-Wisconsin's cases don't help it. In *Market Street Associates Ltd Partnership v. Frey*, 941 F.2d 588 (7th Cir. 1991), one party "deliberately … took advantage" of its "contracting partner's mistake during the performance stage." *Mkt. St. Assoc. Ltd. P'ship v. Frey*, 941 F.2d 588, 597 (7th Cir. 1991). "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that *could not have been contemplated at the time of drafting*, and which therefore was not resolved explicitly by the parties." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990) (emphasis added). Unlike in *Market Steet Associates*, here the parties contemplated the risk that one Member might not want to contribute additional capital and explicitly resolved that issue within the Operating Agreement. Similarly, *Beidel v. Sideline Software, Inc.*, 2013 WI 56 emphasizes that

"the covenant cannot be used to turn what was specifically authorized in the agreement into a breach." *Beidel v. Sideline Software, Inc.*, 2013 WI 56, ¶ 46.

Similarly, in *East Capitol Realty LLC v. TSA Stores, Inc.*, No. 15-cv-1129, 2016 U.S. Dist. LEXIS 196804 (E.D. Wis. Jan 12, 2016), the defendant sporting goods store terminated a lease agreement after the plaintiff renovated the store in anticipation of the lease. *E. Capitol Realty LLC v. TSA Stores, Inc.*, No. 15-cv-1129, 2016 U.S. Dist. LEXIS 196804, *2 (E.D. Wis. Jan 12, 2016). The allegations in the complaint supported an inference that the defendant used a minor and easily rectifiable breach by the plaintiff as a pretext to terminate the agreement because another sporting goods store had opened in the area. *Id.* at *7–8. In that case, "the allegations of the complaint support the inference that TSA lulled East Capitol into what it thought was an incurable default so that TSA could terminate the lease for reasons unrelated to East Capitol's alleged deficiencies." *Id.* at *15. Here, the allegations in the amended complaint do not support an inference that Ministry "lulled" PIC-Wisconsin into breach as an excuse to terminate the Agreement.

Finally, the parties spend a great deal of briefing debating the Operating Agreement's provisions relating to capital contributions: the contract explicitly provides that one member cannot force the hand of another member to make capital contributions. Section 4.2 of the agreement reads: "if the Managers determine that additional Capital Contributions are reasonably required …, the Managers shall request the Members to make to the LLC additional Capital Contributions. . .. *No Member shall be required to make an additional Capital Contribution*." ECF No. 13-1 at 17 (emphasis added). The contract thus makes clear that a member has the right *not* to contribute. PIC-Wisconsin protests that its financial contributions to the Joint Venture were *not* "capital contributions" subject to Section 4.2 of the agreement.

But even if it's true that their cash infusions were "non-capital" infusions (loans, or something else), it remains opaque why the implied covenant of good faith would step in to require defendants to make similar *non*-capital infusions. That is, if their agreement specifically exonerates members from making additional *capital* contributions, why would an implied covenant mandate the complete opposite with respect to *non*-capital contributions?[3] If anything, Section 4.2 demonstrates that matters like contributions (capital or otherwise) are best left to be negotiated by the parties, not supplied by a court after the fact. In sum, regardless of how the plaintiffs' cash infusions are best described, neither the agreement nor the implied law of good faith and fair dealing imposed on the defendants any obligation to follow suit or to make affirmative communications about their intentions. Accordingly, I will grant Ministry's motion to dismiss count 1.

## II.     Repudiation

In count 5, plaintiffs allege that Ministry[4] repudiated several agreements when it "refused to recognize the existence of the Operating Agreement, the Billing Services Agreement, the Management Agreement, and other contracts at issue in this case." ECF No. 13 ¶ 146. The plaintiffs allege, in the alternative, that Ministry acted inconsistently with the contracts' existence. *Id.* ¶ 147. Ministry contests the claim only as it relates to the Operating Agreement. *See* ECF No. 17 at 15; ECF No. 24 at 9.

"In order to constitute an anticipatory breach of contract (repudiation), there must be a definite and unequivocal manifestation of intention on the part of the repudiator that he will

---

[3] And supposing the contributions were deemed loans rather than capital contributions, that would seem to violate the agreement as well. Section 7.15(i) requires unanimous manager approval to "incur outstanding indebtedness in excess of $100,000 in the aggregate[.]" ECF No. 13-1 at 29. Allowing the Joint Venture to incur debt by the unilateral action of PIC would re-write this express provision.

[4] PIC-Wisconsin and PIC voluntarily withdrew their claim against Ascension in count 5. ECF No. 21 at 13.

not render the promised performance when the time fixed for it in the contract arrives." *Wis. Dairy Fresh, Inc. v. Steel & Tube Prod. Co.*, 122 N.W. 361, 367 (Wis. 1963). To support count 5, plaintiffs point to these two facts:

- "The JV has ongoing obligations to pay leases at urgent care clinics. Ministry and Ascension have refused to recognize the existence of these liabilities." ECF No. 13, ¶ 150.
- "Ministry and Ascension continue to obstruct progress and offer no commitment for their growing debt to Plaintiffs and the significant amount of future financial obligations, to which they are legally bound." *Id.* ¶ 13.

Although these allegations relate to various leases, they do not suggest that Ministry has repudiated the Operating Agreement. *See* ECF Nos. 13-3, 13-4. As discussed earlier, Ministry's conduct was not specifically barred by the Operating Agreement, and therefore its conduct or silence cannot be construed as an unequivocal repudiation of that agreement. Accordingly, the claim will be dismissed inasmuch as it alleges repudiation of the Operating Agreement.

### III.   Unjust Enrichment

In count 4, plaintiffs allege that Ministry and Ascension were unjustly enriched by PIC "provid[ing] accounting and administrative services for the JV, as well as for other business ventures." ECF No. 13 ¶¶ 140–41. Ministry and Ascension argue that valid contracts control the conduct and relationships, and a valid contract defeats an unjust enrichment claim. ECF No. 17 at 13–14. PIC counters that Ascension wasn't a party to the Operating Agreement, and neither defendant signed the Billing and Support Services Agreement. ECF No. 21 at 16. Under Wisconsin law, "choice-of-law decisions are 'made on an issue-by-issue basis.'" *BB Syndication Servs., Inc. v. First Am. Title Ins. Co.*, 780 F.3d 825, 829 (7th Cir. 2015) (quoting *Beard v. J.I. Case Co.*, 823 F.2d 1095, 1099 (7th Cir. 1987)). The parties agree that Wisconsin law should apply to the equity claims. *See* ECF No. 17 at 9; ECF No. 21 at 5–6.

"If the parties entered into a valid, enforceable contract, then unjust enrichment does not apply." *Id.* Here, the parties' relationships and conduct were subject to valid, enforceable contracts. *See* ECF Nos. 13-1, 13-2, 13-5. And the relevant conduct underlying the contract and equity claims is the same: Ministry didn't pay PIC for its contributions—services or cash—to the Joint Venture. Given the existence of a valid contract, the unjust enrichment claim should be dismissed.

It does not matter that the parent companies weren't parties to the Operating Agreement, nor that the defendants weren't parties to the Billing and Support Services Agreement. The agreements all cross-reference each other, memorializing the parties' expectations and responsibilities at the time of contracting. The allegations mirror disputes "in which subcontractors, unable to recover from the general contractor with whom they contracted, have sought to recover payment for labor and materials directly from property owners on a theory of unjust enrichment." *Puttkammer v. Minth*, 266 N.W. 2d 361, 363–64 (Wis. 1978). In those cases, a subcontractor cannot recover from the owner because "the owner has paid, or is obligated to pay, the general contractor for the value of the improvements. Retention of the benefits is therefore equitable." *Id.* "In a sense it can be said that the contractor … seeks to make the owner an insurer of the contract entered into by the defaulting [general contractor]." *Id.* at 365.

So too here: Ministry paid into the Joint Venture, which then hired PIC. PIC cannot expect Ministry to become "an insurer of the contract" between the Joint Venture and PIC. *See id.* Ministry's acquiescence to or knowledge of the subcontractor does not create an implied contract: "that the owner knew of the work, acquiesced in its performance and voiced no disapproval of the work, does not make the owner liable." *Id.*

The plaintiffs' cases also emphasize that, if a contract is valid, equity claims should be dismissed. Plaintiffs selectively quote *Northern Group. Inc. v. Tech 4 Kids Inc.*, 352 F. Supp. 3d 882 (E.D. Wis. 2018): "Northern Group asserted in its complaint a claim of unjust enrichment in the alternative to its claim for breach of contract. This was entirely proper." ECF No. 21 at 15 (quoting *N. Grp. Inc. v. Tech 4 Kids Inc.*, 352 F. Supp. 3d 882, 887 (E.D. Wis. 2018)). That court then goes on to say that, having found a valid contract, "it is unclear why Northern Group's alternative claim for unjust enrichment should continue. The dispute that remains seems to be over the terms of the contract, not its existence. Under these circumstances, I conclude that the unjust enrichment claim should be dismissed." *Tech 4 Kids Inc.*, 352 F. Supp. 3d at 888. Valid contracts cover the allegations underlying the plaintiffs' contract and unjust enrichment claims, so count 4 must be dismissed.

## V. Quantum Meruit

Count 6 is pled "in the alternative, if Ministry and Ascension contend there is no valid and enforceable contract." ECF No. 13 ¶ 153. Specifically, the amended complaint alleges that "PIC engaged in a contractual relationship with the JV, and by privity, with Ministry and Ascension for the execution of certain accounting, financial, and operational duties for the benefit of the JV." *Id.* ¶ 154. "[T]o recover under quantum meruit, the plaintiff must prove that 'the defendant requested the [plaintiff's] services' and 'the plaintiff expected reasonable compensation' for the services." *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469 (quoting *Ramsey v. Ellis*, 484 N.W.2d 331, 333 (Wis. 1992)).

Count 6 was explicitly pled in the alternative and can be dismissed because the defendants do not challenge the validity of the underlying contract. ECF No. 13 ¶ 153. Also, the amended complaint fails to state non-conclusory allegations showing a claim for relief

based on quantum meruit—no alleged facts show that Ministry or Ascension "requested plaintiff's services" or that PIC "expected reasonable compensation" from Ministry or Ascension. *Lindquist Ford, Inc.*, 557 F.3d at 478. Accordingly, count 6 is dismissed as well.

## CONCLUSION

For the reasons given above, I will grant the defendants' motion to dismiss counts 1, 4, and 6, and to dismiss count 5 to the extent it alleges repudiation of the Operating Agreement [ECF No. 16]. The defendants' previous motion to dismiss [ECF No. 9] is denied as having been motted by the filing of an amended complaint. Because all counts against Ascension have been dismissed, Ascension is dismissed as a defendant.

**SO ORDERED** this 16th day of July, 2025.

_____
STEPHEN C. DRIES
United States Magistrate Judge